ODELL MILLER *v.* FAIRFIELD BAY, INC. ET AL

5-5013                                        446 S. W. 2d 660

Opinion delivered November 10, 1969

*Allan, Dahlen & Young,* for appellant.

*Warner, Warner, Ragan & Smith,* for appellees.

CARLETON HARRIS, Chief Justice. This appeal relates to the validity of an employment agreement between the employer, Fairfield Bay, Inc., one of the appellees herein, and the employee, Odell Miller, appellant herein. Fairfield Bay is a vacation-retirement development on Greers Ferry Lake in Van Buren County, where appellant was employed as a real estate salesman, and while so employed, made numerous sales. This employment commenced in March, 1967, and on the ninth day of that month, an employment agreement was entered into between the parties. The remuneration (which was in the form of commissions) to be paid Miller was not a part of this contract, Section 2 reciting:

"The remuneration to be paid Employee has been agreed upon by the parties, and being subject to change, is not specified herein."

Section 3 provides as follows:

"Employee agrees as a condition of this employ-

ment, that during the term of his employment and for a period of three years thereafter, he will not directly nor indirectly engage in competition with Employer in the sale or development of residential or commercial real estate within a fifty (50) mile radius of Greers Ferry Lake, Van Buren and Cleburne Counties, Arkansas. Employee further agrees as a condition of this non-competition clause, that he will not directly or indirectly purchase any real estate for investment or development within said area during the term of this non-competition agreement, without the express written consent of Employer. The term 'direct or indirect' as used herein, shall without limiting the generality of said language, include participation by Employee or his spouse as a partner, shareholder, officer, employee, agent, consultant or in any other advisory or direct association with any partnership, corporation, firm or association or other business enterprise of any sort which is engaged in competition with Employer in the development of land in the above described area.''

Section 4 provides that the agreement may be terminated by any party at any time, but the terms of the no competition clause (Section 3) shall remain in full force and effect.

Several months after this employment, appellant was licensed with appellee Shirley Realty Company, hereafter called Shirley, under which employment, Miller made numerous other sales, also on a commission basis. Shirley is an affiliate of Fairfield,[1] and was created in June of 1967 to handle the Fairfield Bay sales; Shirley sold nothing but Fairfield property. Miller's remuneration, under both companies, was 1/3 of the initial down payment, and 1/5 of the monthly installments, this last continuing until he had received 10% of the total sale price. In November, 1968, appellant terminated his employment with Shirley, and licensed with

[1]Fairfield and Shirley have common officers and directors, but no cross-ownership of stock.

another broker, within the prohibited radius, who was a potential competitor of appellees.

The two companies thereafter refused to pay to Miller the commissions that had accrued from the payment of installments, and appellant instituted complaint against them for the amounts that he contended to be due, $5,113.10 from Fairfield, and $13,808.50 from Shirley. After the filing of an answer, the case was tried, and at the conclusion of the evidence, the court found that Miller was not entitled to these accruals, since he had breached his contract with the companies, the breach being material, and thus precluding him from recovery. From the decree so entered, Miller brings this appeal.[2]

Miller, who had been employed at Cherokee Village before going to Fairfield, testified that the projects of those two companies were about the same, except that the commission given was a little different. He stated that very few customers lived within a 50-mile radius of Greers Ferry Lake, and he testified that he had not contacted a single customer of Fairfield relative to buying a lot from his new employer.

Fairfield's operation was explained by George Jacobus, president and general manager of the company. He testified that most of the customers come from states that surround Arkansas, particularly Tennessee and Texas, and he said that the company conducts an advertising campaign to get the people into the area. Jacobus said that it was essential to have the non-competition clause in the contract, because:

"* * * when a man who knows what my advertising schedule is, who receives my pay while he finds out that and then sets up his office on the route that these customers are coming in, then he is damaging me."

---

[2]There was also a controversy between Miller and one of the appellees relative to the sale of a house, and the court granted a recovery to appellant. Notice of cross-appeal was given by appellee, but the cross-appeal was not further pursued, and is not an issue in this litigation.

The witness stated that the company used directories and telephone books for the "mail out," and that the salesmen helped with the "mail out," actually running some of the envelopes through the stamp machine, and carrying them to the post office. He said that the telephone directories of every city in the trade territory were used in getting the names, and added that these telephone books belonged to the company, "we sent away and paid for them and then we edit them."

As to the general duties of a salesman Jacobus said that, after the sale was effected, and the down payment made, it was the salesman's "responsibility to contact these people if these folks should write a letter requesting some information or have a problem of some type it is up to the individual sales representative to answer this, to write a letter over his signature. We make a very important emphasis on the fact that every customer belongs to the sales representative who sold him that lot. He is the direct link between the company and that person. So, if these people get a little behind on their payments, the salesman is the one to contact them, he may be able to renegotiate a deal if they have had some hardship where they will still be able to protect their equity in the property, and if a salesman leaves then we have to do this at our expense."[3]

Admittedly, however, this is not a duty which is set forth in the employment agreement. From the record:

"Q. Now, on the salesman follow up with customers; of course, the salesman has an interest, I believe, in keeping the account going, in that he gets the renewal as long as they come in?

A. That is right, yes, sir.

---

[3]Jacobus never did testify that sales made by Miller had to be "followed up" by some other employee of the company in order to obtain the monthly payments. As far as the record here is concerned, Miller's customers voluntarily made their payments.

Q. This is something you don't put in the employment contract, they are glad to do it in order to get the sales to stay on track and completed, isn't that right?

A. I don't want to quibble about that, but they are not really glad to do it, they had to be urged; we have to keep having them follow up, but they do it, yes.

Q. This is no duty you put in any employment contract or in Mr. Miller's contract?

A. No, sir.''

When interrogated as to the special knowledge and skill required of one who desires to work for his company, Mr. Jacobus replied that such an applicant would have to have sales ability, a real estate license, an automobile, a radio, "has to be presentable," and have the ability to sell property.

Charles Coleman, comptroller for Fairfield Bay and its affiliated companies, testified that, as of September 30, 1968, Miller was owed $3,237.49, with deferred commissions of $8,275.96, if all contracts continued to pay.

We think the court erred in denying appellant any recovery. This denial, of course, was based on Miller's breach of the non-competition clause of the agreement, and we are of the view that this provision was invalid.

We have pointed out that each case involving a restraint to compete must be determined by the facts of the particular case, and we have, accordingly, never laid down any rule governing provisions as to area or length of time. The case that seems to most closely parallel the facts of this litigation is *McCumber* v. *Federated Mutual Implement and Hardware Insurance Company*, 230 Ark. 13, 320 S. W. 2d 637. There, we held that a contract,

restraining competition for two years after cessation of employment involving no trade secrets, was void as an unreasonable restraint on trade. This was an agreement entered into between an insurance company and one of its local agents, wherein McCumber agreed that he would not engage directly or indirectly as a competitor in the insurance business for a period of two years after terminating his employment. He quit the company, and commenced an insurance agency of his own; the insurance company instituted suit against him, alleging this provision of the contract, and seeking an injunction. While working with the company, McCumber's territory covered the nine Central Arkansas counties, but, on hearing, the trial court enjoined McCumber from directly or indirectly engaging in competition with the company for a period of two years, but in Pulaski County only (the largest county in the nine county area). On appeal, we reversed the trial court, and, in doing so, stated:

"This case involves neither the sale of a business, nor an employment having trade secrets: so cases of those situations are not applicable. We have here merely a restrictive covenant for two years after cessation from a business, without trade secrets of any kind."

The opinion pointed out that the case was similar to *American Excelsior Laundry* v. *Derrisseaux,* 204 Ark. 843, 165 S. W. 2d 598, in that no trade secrets were involved.

Here, as in *McCumber,* we have neither the sale of a business, nor an employment having trade secrets. It is also interesting to note that, in *McCumber,* the employee was only restrained from operating in one county, though his employment contract with Federated Mutual had included nine counties; nonetheless, we held that a two-year restraint for the one county was un-

---

⁴According to the American Heritage Dictionary of the English Language (1969), a "trade secret" is: "A secret formula, method, or device that gives one an advantage over competitors."

reasonable, and therefore, void. The restraint for a 50-mile radius in the present instance, according to the Arkansas State Highway map for 1969, appears to include portions of 12 counties.

Miller obtained no trade secrets from his employment. He had previously worked for Cherokee Village, a development company, before entering upon his employment for appellee, Fairfield Bay, and the testimony reflects that the two operations were quite similar. Certainly, there were no trade secrets involved, as in *Orkin Exterminating Company* v. *Murrell*, 212 Ark. 449, 206 S. W. 2d 185, where a contract containing a similar restrictive clause was upheld. In that case, trade secrets were involved, the company maintaining a research department, wherein the nature and habits of insects and rodents were ascertained, and chemicals and compounds were prepared to be used in the destruction of these pests without danger to human beings or damage to furniture or woodwork. Chemicals were mixed and formulae reported. Those circumstances were, of course, vastly different from the circumstances in the case before us. Here, as in *McCumber,* telephone directories. were a major source utilized for compiling names of prospects. It is true, as mentioned by Mr. Jacobus, that the directories belonged to his company, but there was certainly nothing to prevent any other company, or salesmen, from likewise acquiring identical telephone books. In *Orkin Exterminating Company* v. *Murrell, supra,* though trade secrets were involved, the restriction imposed upon the employee was that he not compete for *one year* after leaving the employment. Here, the restriction is for three years, though no secret method of obtaining prospects was involved, nor any special training or skill required of the employee. In fact, as previously mentioned, Mr. Jacobus testified that a salesman would need sales ability, a real estate license, an automobile, and a radio.

The period of three years is unreasonable. Even if

the duties of the salesmen enabled them to ascertain what prospective customers were about to be interviewed, this information could only be of use for a few months; certainly, visits from prospects were not lined up for several years in advance, and the statement of Mr. Jacobus that a competitor could set up his office "on the route that these customers are coming in," and thus damage him, does not appear exactly logical.

--We conclude that, under the facts of this case, the contract, because of the length of the restriction not to compete, and the right of the employer to terminate employment, is against public policy, and void.[5]

The decree is, therefore, reversed, and the cause is remanded to the Van Buren County Chancery Court, with directions to determine the sum due Miller, based upon accruals resulting from sales made by him for the companies while in their employ.

It is so ordered.

---

[5]This finding makes unnecessary a discussion of two interesting questions, which might well be pertinent, if we found the contract valid, *viz.,* would the Shirley Company be entitled to the benefit of the no competition agreement that Miller entered into with Fairfield Bay, Shirley not even being in existence until after the questioned agreement was executed? Also, would the companies have the right to withhold monies due Miller as commissions from sales made for their companies, solely because he later violated the agreement not to compete, or would they simply be entitled to injunctive relief?