RECTOR-PHILLIPS-MORSE, Inc. *v.* George
Richard VROMAN

5-6136

489 S.W. 2d 1

Opinion delivered January 15, 1973

*House, Holmes & Jewell,* by: *Robert L. Robinson Jr.,* for appellant.

*Edward L. Wright Jr.,* for appellee.

George Rose Smith, Justice. The appellant, referred to by the parties as RPM, brought this suit to enjoin George Richard Vroman, a former RPM employee, from competing with RPM in Pulaski county for a period of three years after the termination of Vroman's employ-

ment with RPM. This appeal is from a decree denying relief, upon the ground that Vroman's employment involved no trade secrets and that the three-year restriction was unreasonably long.

Vroman, a real estate salesman, had been in RPM's employ for a few years when the contract in issue was signed on February 1, 1969. RPM then had some 31 salesmen. W. F. Rector, RPM's principal officer and stockholder, testified that eight of the best salesmen, including Vroman, were offered employment contracts as an inducement for them to stay with RPM. Those men were allowed to buy RPM corporate stock. Vroman, for example, bought $2,583.33 worth of stock, which he resold to RPM for $3,750 when he left the company.

By the contract RPM employed Vroman upon a commission basis for five years, subject to either party's right to end the relationship upon 30 days notice. Vroman agreed that upon the termination of the contract for any reason other than its expiration he would not compete with RPM in Pulaski county in any way for three years. After two years and ten months of the five-year term Vroman resigned and went into the real estate business for himself, with two associates. This suit followed.

Our study of the record persuades us that there are compelling reasons for sustaining the trial court's refusal to grant injunctive relief.

First, the chancellor's conclusion that no trade secrets were involved is not against the weight of the evidence. Rector testified that valuable secret information was recorded upon indexed cards for about 350 commercial properties, 929 potential investors in land, about 2,500 residential units, and from 6,000 to 7,000 sales previously closed by RPM, making a total of about 10,000 cards or files. All RPM salesmen had access to the information, as needed in their work.

A trade secret may be defined as a "secret formula, method, or device that gives one an advantage over competitors." *Miller* v. *Fairfield Bay*, 247 Ark. 565, 446 S.W. 2d 660 (1969). Here most of the information upon the cards cannot fairly be said to have been secret. With

respect to commercial and residential property the cards showed data such as description, location, zoning, taxes, access to utilities and transportation, rentals, and similar facts. According to the proof, much of the information is always available from public sources, though not in such accessible and concentrated form as the RPM data. We conclude, as did the chancellor, that the card-indexed information was not secret. At best it was confidential, in the sense that no company engaged in business for profit voluntarily opens its records to examination by its competitors.

Secondly, the contractual restriction upon Vroman's engaging in a rival business for three years was not reasonably necessary to protect RPM from *unfair* competition and would not actually achieve that result. About 10,000 cards were accessible to RPM salesmen. If each card contained five items of information—a conservative estimate—Vroman had access to some 50,000 assorted facts. There is no suggestion that Vroman, in leaving RPM, either took any written data with him or attempted to memorize it. In fact, Vroman's uncontradicted testimony is that he did neither. Needless to say, there is no showing, as there was in *All-State Supply* v. *Fisher*, 252 Ark. 962, 483 S.W. 2d 210 (1972), that the departing employee was able to use his former employer's information to gain an unfair competitive advantage.

Moreover, there were no restrictions upon the right of 23 of RPM's 31 salesmen to resign and enter into competition with RPM in Pulaski county. When Vroman left RPM he went into business with two other former RPM employees, who are not shown to have signed a contract like Vroman's. Those two men had had access to the RPM cards. Thus an injunction against Vroman would not have protected RPM against the possibility that its data might be legitimately used by the newly organized real estate firm.

Thirdly, the three-year restriction was too long. Rector testified that a three-year period was selected because at the end of that time most of the information would be so out of date as to be relatively useless to a former employee. Rector, however, did not say that the data would actually be useful for three years or for anything approach-

ing that length of time. The record suggests that the useful life of the information was far below three years. The cards were constantly being brought up to date to reflect changing conditions. It is not argued that a departing employee could retain 50,000 items of fact in his mind for three years, or even for three months. It is thus apparent that the three-year limitation was unreasonably long, and this is especially true in view of RPM's power to terminate the agreement upon short notice. See *Miller* v. *Fairfield Bay, supra.*

Even though the three-year restriction is excessive the appellant argues that it is entitled to some lesser relief, a six-month injunction being suggested. This argument is based in part upon certain recent cases in other jurisdictions, to be discussed in a moment, and in part upon the following language in the Vroman contract:

> "It is the intent of the parties to restrict the activities of Vroman only to the extent necessary for the protection of legitimate business interests of RPM and they specifically covenant and agree that should the above provisions, under any set of circumstances not now foreseen by the parties, be deemed too broad for that purpose that said provisions will, nevertheless, be valid and enforceable to the extent necessary for such protection."

Our rule is that when a restriction such as this one is too far-reaching to be valid, the court will not make a new contract for the parties by reducing the restriction to a shorter time or to a smaller area. *Brown* v. *Devine,* 240 Ark. 838, 402 S.W. 2d 669 (1966); *McLeod* v. *Meyer,* 237 Ark. 173, 372 S.W. 2d 220 (1963).

We are firmly convinced that parties are not entitled to make an agreement, as these litigants have tried to do, that they will be bound by whatever contract the courts may make for them at some time in the future. Such a doctrine would confer upon the courts the power to make private agreements—a matter certainly not within the judicial province as it has been traditionally understood in our law.

The New York Court of Appeals has, in two cases, firmly and correctly rejected suggestions similar to the one now before us, In *Stoddard* v. *Stoddard,* 227 N.Y. 13, 124 N.E. 91 (1919), the parties to a maintenance contract in a divorce case inserted a clause purporting to authorize the court to modify the agreement to meet any material change in the circumstances of either spouse. The court quite properly refused to make a contract for the parties, saying:

> "Thus we come to the question already outlined, whether the Supreme Court had jurisdiction to take hold of one of the provisions of this contract and determine the reasonable amount to be paid by one of the parties to the other and in that respect make a new agreement for them. We know of no principle, and we have been cited to no authority, which authorizes the court in this way, in effect, to write a clause in the contract for the parties. While the parties to this particular contract have attempted to agree that the court might exercise this jurisdiction, it really is not claimed that that agreement confers upon the court powers which it does not inherently possess. It seems to us that this case is not other than it would be if two parties making a contract for the sale of real estate at a fixed price, to be executed at some distant day, should provide that if conditions changed in the meantime the court should determine what would be a fair sum to be inserted in the contract as the purchase price of the real estate. We think it would scarcely be claimed with seriousness that the court could do this even on an agreement of the parties, and it does not seem that the present proposal is any different in its nature."

A decade later, in *In re Buffalo & E. Ry. Co.,* 250 N.Y. 275, 165 N.E. 291 (1929), the parties to a labor contract attempted to provide in the agreement that if a dispute arose a state arbitration board, which was part of the judicial system, might modify the contract. In holding that no such jurisdiction could be conferred the court said:

> "No power exists in the courts to make contracts for people. They must make their own contracts. The

courts reach their limit of power when they enforce contracts which parties have made. A contract that the court shall determine what an agreement shall be for the future is unenforceable, unless the lines of the agreement have been laid out by the parties. The most a court may do is to determine some incidental fact, as for example the reasonable value of property or services, and thereupon enforce the agreement, by judgment for damages, if not specifically, with such value written into it."

The principles stated by the New York court are applicable here. It must be remembered that, *in the absence of an agreement,* an employer has no remedy in equity to restrain a former employee from engaging in a competitive business within a certain area or for a certain length of time. The remedy is based upon the contract and is nonexistent without it. Hence the present contractual attempt to agree upon whatever restriction may be valid and enforceable, if the parties' covenant proves to be excessive, is in fact an attempt to delegate to the court the power to make a new contract, which the employer then seeks to enforce by an application for injunctive relief.

Our comments upon RPM's contractually based argument apply equally to its alternative reliance upon certain recent decisions and textbook discussions. Those authorities take the position that even when the parties' restrictive covenant is excessive and by its terms indivisible, the court should nevertheless grant injunctive relief to whatever lesser extent is found to be reasonable upon the facts of the case. *Ehlers* v. *Iowa Warehouse Co.,* Iowa, 188 N.W. 2d 368 (1971); *Solari Industries* v. *Malady,* 55 N.J. 571, 264 A. 2d 53 (1970); *Fullerton Lbr. Co.* v. *Torborg,* 270 Wis. 133, 70 N.W. 2d 585 (1955); Corbin, Contracts, § 1390 (1962); Williston, Contracts, § 1660 (rev. ed., 1937); cf. Comment, 21 Ark. L. Rev. 214 (1967).

Such a practice of granting partial injunctive relief not only amounts, as we have seen, to a judicial rewriting of the parties' contract; it also has a clear tendency to provoke unnecessary litigation. That is, even though the restriction is unreasonably far-reaching the employer

has nothing to lose by going into court and seeking partial injunctive relief.

Williston, *supra,* suggests that the latter difficulty can be avoided "in part at least" by completely invalidating covenants that are deliberately unreasonable and oppressive. That solution is apt to be ineffective, for the employer, forewarned, has only to make a restrictive contract ostensibly within the outer boundaries of reasonableness to avoid the penalty proposed by Williston.

After studying the problem we are convinced that our prior decisions, refusing to rewrite contracts such as this one, are sound. We must therefore decline the appellant's invitation to rewrite this contract, either directly, by giving effect to the parties' agreement to accept whatever modification the court may find to be reasonable, or indirectly, by approving a limited injunction that would in effect enforce a contract that the parties might have made but did not make.

Affirmed.

FOGLEMAN, J., not participating.