ORKIN EXTERMINATION COMPANY,
INC. *v.* Albert R. WEAVER

74-311                          521 S.W. 2d 69

### Opinion delivered April 7, 1975
[As Amended April 21, 1975.]
[Rehearing denied April 28, 1975.]

*Coleman, Gantt, Ramsay & Cox,* for appellant.

*Baim, Baim & Mullis,* for appellee.

GEORGE ROSE SMITH, Justice. The appellant Orkin is engaged in the pest control business in many states. The appellee Weaver worked for Orkin, as a sales and service representative, from 1965 until he was discharged in 1973 for having failed to file reports of his calls upon customers. Within a week Weaver re-entered the pest control business, in partnership with another former Orkin employee. Orkin then brought this suit to enforce, by injunction, a provision in Weaver's contract of employment by which he agreed not to engage in the pest control business in certain areas for a period of two years after the termination of his employment by Orkin. The chancellor denied relief, finding the contractual provision to be invalid. We agree with his decision.

Inasmuch as Orkin relies upon our holding in *Orkin Exterminating Co. v. Murrell,* 212 Ark. 449, 206 S.W. 2d 185 (1947), we may conveniently use that opinion as a basis for our discussion of this case. There Murrell had resigned as the manager of Orkin's Little Rock office and had gone into the pest control business for himself. Murrell's contract, as compared to Weaver's, was less restricted as to time — one year instead of two years — but was broader as to territory. We sustained the contract, upon proof that trade secrets, special training, confidential information, and access to lists of customers were involved. We need only compare the facts in the *Murrell* case to the facts in this case, which are practically undisputed.

First, trade secrets and confidential information. More than 25 years ago, when *Murrell* was decided, there may have been such esoteric data, but according to the present record that condition no longer prevails. Training in the field is available at the college level, in Arkansas. Technical manuals upon the subject can be purchased. The Arkansas Association of Pest Control is a source of information to its members. The pesticides used in the business are available upon the open market to the public in general. Federal law requires that directions for their use be set forth on the label. The witness Henry, who was Orkin's manager when Weaver was discharged, testified:

> Q. Now, in your opinion, while this man was an employee of yours at Orkin Exterminating Company, did he have access to any trade secrets?

> A. Really, I don't believe you would call them trade secrets. It was just information that the company felt should be kept confidential. But information that if you wanted to research all facilities that are available you could come up with it.

> Q. Not information that Orkin and Orkin alone had, is that correct?

> A. That's right.

In *Rector-Phillips-Morse* v. *Vroman*, 253 Ark. 750, 489 S.W. 2d 1 (1973), we held that such information — "confidential" in the sense that no company voluntarily opens its records to its competitors — is not secret information in a case such as this.

Next, the matter of special training. Weaver worked for Orkin for more than seven years, during which he attended four or five training schools. He testified: "I wouldn't call it special training. I mean, if you have been to one meeting you have been to all of them." That testimony is not contradicted. There is nothing to suggest that Orkin did anything more than train its own employees, as a matter of self-interest, to be proficient in their jobs. There is no proof that similar training was not readily obtainable elsewhere.

Finally, in *Murrell* we stressed the former employee's "access to all records, customers' lists and credit ratings." Murrell, however, was a branch manager and as such had access to all records in the office. By contrast, Weaver was a route man who was familiar only with the list of some 250 customers that he serviced every month. That familiarity was essential to the performance of his duties. Orkin's witness Richardson, its Pine Bluff manager at the time of the trial, readily admitted that he could not think of any salesman for any company in the United States who did not have contact with customers.

In *Murrell* we noted that Orkin's former employee solicited and procured "a large number" of its best customers. In the case at bar Orkin proved that it had between 702 and 850 customers who subscribed to its monthly pesticide service, plus 4,000 subscribers to its annual termite service. In its case in chief Orkin proved that Weaver obtained exactly one of its customers after he left Orkin (but it was shown later in the case that the customer in question was not even in the area protected by the contract). Weaver readily admitted, in response to questions by his own attorney, that he was servicing 18 persons or firms that "might" have been Orkin's customers. Thus the proof at the time of trial, almost a year after Weaver's discharge, was that he had obtained at most 18 out of the 702 monthly customers that Orkin had. Orkin's manager admitted, however, that the company lost about 40% of its customers every year, by normal attrition.

The basic flaw in Orkin's position is that its contract, according to its own proof, is directed not against *unfair* competition but against competition of any kind on the part of its former employees. Upon this point Orkin introduced its current manager, Richardson, who explained the reason for the contract, in these words:

> The main reason is, you take a man, you train him in the business, you send him out to service a customer, and they develop a personal contact with the customers, personal relationships, then should they leave for any reason and go in a business of their own

they still have this personal contact which means that they have the ability, the opportunity to take a customer from us as their own.

Orkin's other witness, its former manager, Henry, testified:

Q. And this agreement was strictly an agreement that was to, in your opinion, hold down competition by former salesmen and former employees, is that correct?

A. I believe that's absolutely the only reason for it.

Q. It had nothing to do with the trade secrets and confidential information?

A. No, sir.

Precisely the same point of view is urged in Orkin's brief in this court: ". . . preventing a former employee from competing against his employer and using the training, skills and information acquired from his employer is a valid reason for restriction."

If Orkin's position is sound, then any employer in any business devoted to selling — whether the sales be of insurance, real estate, clothing, groceries, hardware, or anything else — can validly prohibit its former salesmen from engaging in that business within the vicinity for as long as two years after the termination of employment. Needless to say, the law does not provide any such protection from ordinary competition. *Vander Werf* v. *Zunica Realty Co.*, 59 Ill. App. 2d 173, 208 N.E. 2d 74 (1965); *Renwood Food Products* v. *Schaefer*, 223 S.W. 2d 144 (Mo. App., 1969); *Grace* v. *Orkin Exterminating Co.*, 255 S.W. 2d 279 (Tex. Civ. App., 1953); *Lakeside Oil Co.* v. *Slutsky*, 8 Wis. 2d 157, 98 N.W. 2d 415 (1959); *Herbert Morris, Ltd.* v. *Saxelby*, [1916] A.C. 688, Ann. Cas. 1916D, 537.

Orkin also relies upon a paragraph in the contract which recites that if a court should find the territorial restrictions to be unreasonable, then the restrictions are to be limited to any portions of the entire territory that were worked by the

employee during any period of 90 days or more within the last twelve months preceding the termination of the agreement. We need not discuss this point, because of the invalidity of this contract is not due only to the territorial restrictions. (And see *Rector-Phillips-Morse* v. *Vroman, supra.*)

Finally, after studying the language of the contract we cannot say that the chancellor was wrong either in awarding Weaver two weeks' separation pay or in denying him two weeks' vacation pay.

Affirmed on direct and cross appeal.

HARRIS, C.J., not participating.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. Since I feel that the majority has unduly limited the legitimate area of protection by a covenant not to compete, I must dissent. I do not consider the distinctions made between this case and *Orkin Exterminating Co.* v. *Murrell*, 212 Ark. 449, 206 S.W. 2d 185 to afford adequate basis to justify failure to apply its principles.

The "trade secrets" or confidential information involved here is far different from that in *Rector-Phillips-Morse* v. *Vroman*, 213 Ark. 750, 489 S.W. 2d 1. There this court said that a trade secret may be defined as a secret formula, *method,* or *device* that gives one an advantage over competitors. Admittedly, Orkin's confidential technical manuals told its sales and service personnel *how to service* its customers. An Orkin employee taught Weaver procedures. Confidential technical bulletins prepared by Orkin's research and development section disseminated among its employees disclose the latest ideas and recommendations of the employer in treating procedures and on chemicals that can or cannot be used in particular areas. The chemicals are not specifically found on the market, but since federal law requires that the ingredients be shown on a label, an employee could learn which chemicals to buy on the open market in order to provide service to a customer. Orkin has patent rights, not on the chemicals, but on the mixtures. One can buy the chemicals

that go into Orkin's mixtures but not the mixtures.

To operate successfully in the pest control business, one must have a working knowledge of the problems that could be encountered in a particular business being served, of the various insects that might be anticipated, how they multiply, where and how they hibernate, the areas to be searched, the particular chemical to be used to treat the specific infestations found, the strength to be achieved by mixing chemicals, and the types of areas in which applications should or should not be made. All these techniques, chemicals and application procedures are kept confidential. Weaver did have access to all Orkin's mixtures of chemicals, methods of application and techniques, all of which were confidential.

Weaver attended four or five statewide school sessions. The information he received there was confidential. He admits that 90% of his training came from Orkin.

Weaver named 18 concerns as *some* of the customers he now services who were once customers of Orkin, but said that he was not *completely* sure about them. He was sure that he serviced customers that were once those of Orkin. His wife did actively solicit some of them. He testified that he did not solicit them "directly". The strange coincidence of Orkin's customers requesting service by Weaver might be explained by his across-the-coffee type method of saying that he was in business for himself, instead of just walking up to the customers and saying, "Can I have your business?", which he said he did not do.

It seems to me that the competition against which Orkin sought to protect itself in this action was unfair. It also seems to me that the manner in which Weaver became a competitor is worthy of consideration. His present partner, Majors, was also a former Orkin employee who left Orkin shortly before Weaver was fired. Weaver, after having worked for Orkin for 7½ years, and with full knowledge that his employer required the filing of daily reports, was terminated for failure to file them for a two week period. Within two or three days, he was associated with Majors, first with another company and

then in a partnership. All his work was in Pine Bluff and southeast Arkansas. He was in direct competition with Orkin.

While Weaver had not had access to Orkin's master customer list during the 7½ year period, he did become familiar with the customers on his own route list. The customers he did not "directly" solicit, but who contacted him "directly" knew him through Orkin. He simply professed to believe that his contract did not apply if he was fired.

Any information needed by a salesman could be obtained from the customer list. He could get the general customer list for the Pine Bluff area, by asking, at least about a specific individual. Pine Bluff, Rison, and from Sheridan to Helena and Stuttgart, constituted Weaver's route. He received a list of customers on his route every day, consisting of 15 to 20 names each. Somehow he knew that Orkin had about 850 customers when he left.

I daresay this is the first such Orkin contract held invalid at the appellate level. See *Grace* v. *Orkin Exterminating Co.*, 255 S.W. 2d 279 (Tex. Civ. App. 1953); *Orkin Exterminating Co.* v. *Veal*, 355 S.W. 2d 831 (Tex. Civ. App. 1962); *Orkin Exterminating Co., Inc.* v. *Wilson*, 501 S.W. 2d 408 (Tex. Civ. App. 1973); *Orkin Exterminating Co.* v. *Wilson*, 227 N.C. 96, 40 S.E. 2d 696 (1946); *Orkin Exterminating Co. of Raleigh* v. *Griffin*, 258 N.C. 179, 128 S.E. 2d 139 (1962); *Orkin Exterminating Co. Inc. of South Georgia* v. *Mills*, 218 Ga. 340, 127 S.E. 2d 796 (1962) See also, *Thomas* v. *Orkin Termite Co., Inc.*, 222 Ga. 207, 149 S.E. 2d 85 (1966); *Orkin Exterminating Co.* v. *Gill*, 222 Ga. 760, 152 S.E. 2d 411 (1966); *Rider* v. *Orkin Exterminating Co.*, 224 Ga. 145, 160 S.W. 2d 381 (1968).

While appellate review has been rendered more difficult because the contract is not abstracted, I do feel that Orkin had property rights in its mixtures, techniques, procedures, business secrets and research developments, and that they were entitled to have them protected. I cannot agree that only ordinary competition is involved here.

Insofar as the territorial restriction is concerned, I think

934

that, to say the least, the less restrictive area could easily be upheld, without the court making a contract for the parties. I do not think that the larger territory was unreasonable.

I would reverse the decree.