REBSAMEN INSURANCE, a Division of
REBSAMEN COMPANIES, INC. *v.* Charles MILTON
and MILTON AND PHILLIPS INSURANCE AGENCY,
INC.

CA 80-6                                    600 S.W. 2d 441
Court of Appeals of Arkansas
Opinion delivered June 11, 1980
Released for publication July 2, 1980

738

*House, Holmes & Jewell*, for appellant.

*Ronnie A. Phillips, Ltd.*, for appellee.

MARIAN F. PENIX, Judge. Rebsamen Insurance, Appellant, purchased Jim Pirtle & Co. Insurance Agency in Fordyce effective January 1, 1978. Jim Pirtle and Charles D. Milton, Appellee, were retained as employees of Rebsamen. An employment contract was executed between Rebsamen and Milton. In the contract Milton covenanted that for a period of two years following the termination of his employ-

ment he would not engage in the business of insurance or any other business in which the Employer Rebsamen is engaged. He also agreed to pay any commission earned from the insurance business to Rebsamen. The contract also provided for injunctive relief. Not long after the purchase Pirtle became ill and Milton did considerable collection work and organized accounts which he and Pirtle had brought to Rebsamen.

Milton left Rebsamen and formed an insurance agency in Fordyce October 30, 1978 called Milton and Phillips Insurance Agency, Inc. (M and P). Rebsamen sued Milton and M and P, alleging Milton had breached the terms of his employment contract by directly soliciting and accepting business from clients of Rebsamen during the prohibited two year period. The complaint asked for an injunction prohibiting violation of the employment contract and damages in an amount of the commissions received by M & P. Milton and M & P counterclaimed for damages based on quantum meruit after an accounting of Milton's commissions, and damages for intentional interference with Milton's peace of mind. Claude Walters was made a third party defendant in the pleading as a joint tort feasor in the alleged tort. The Court entered its final Order October 1, 1979 finding paragraph five (5) of the employment contract broader than necessary to protect Rebsamen, therefore, holding it void as against public policy, Rebsamen's complaint was dismissed and Milton's counterclaim was dismissed.

Rebsamen contends the restrictions imposed by paragraph five (5) were reasonable and necessary for the protection of the legitimate business interests of Rebsamen and should be enforced.

Paragraph five (5) of the employment contract reads:

(5) Employee covenants and agrees that in the event of the termination of his employment for any reason whatsoever that he will not, for a period of two years following the date of termination, either directly or indirectly, individually or as agent, engage in the business of soliciting or accepting any insurance business or other business in which Employer is engaged, from any

customer or account of Employer which is at the time of severance a current account, or which has been a customer at any time within three years prior to such severance. The restrictions on time and space expressed herein are divisible and severable.

Claude Walters, office manager of Rebsamen, testified that during Milton's employment Milton was trained in the methods and procedures used by Rebsamen. Walters also testified Milton learned policy expiration dates. He stated he discovered Milton making a list of Rebsamen customers, including policy expiration dates and amount of commissions. When confronted, Milton gave the information to Walters. Milton was told to clean out his desk. Milton admitted to Walters he was compiling the list to determine commissions he considered were due to him.

Jack Garrison, Senior Vice President of Rebsamen, testified he gave Milton personal guidance in credit procedures, applications, new business, renewal business and customer relations. He testified further that trade secrets in the insurance industry are methods and systems of business other agents don't have. He stated Rebsamen had an economic value to protect.

Garrison learned of Milton's resignaton and met with him. Garrison testified Milton was earning a salary of $14,-000 a year. He said he discussed a bonus with Milton and indicated he would try to arrange for one. Milton declined the tentative offer of a bonus. Garrison maintained Milton received a job and $14,00 a year pay as consideration for entering into the employment contract and covenant not to compete.

Jim Pirtle testified he considered the employment contract which he and Milton both signed to be a reasonable one. He also testified Milton didn't get any additional compensation for the non-competitive agreement with Rebsamen. He stated he did not have such a contract with Milton.

Richard Herget, Jr. testified when he joined Atkins Insurance Corporation he signed an employment contract with

a covenant not to compete. He stated the most valuable asset is the expiration list or customer file which is the basis of every insurance agency. He further stated the protection of the customer list and expiration list is the major reason for the noncompetitive agreement. He testified the only protective device is a covenant not to compete to maintain integrity of their files since an insurance company spends a tremendous amount of money in developing customer relationship through advertising, contracts and training of the employees. He testified the Internal Revenue Service has recently ascertained an agent's expiration list is a depreciable asset thereby recognizing the list is an economic value to protect. He also stated the use of restrictive covenants in employment contracts is recognized as a standard in the insurance industry.

William Grace, Senior Vice-President of Risk Management Department of Rebsamen Insurance testified Rebsamen had exposed Milton to the markets which Rebsamen had available which the Pirtle Agency had not had prior to their purchase. He stated Rebsamen gave Milton background information, training and methods with which Milton should operate with specific accounts. He stated they are trade secrets in the insurance industry. However, Grace admitted that when Pirtle became ill on January 21, 1978 he asked Milton to relieve himself of Rebsamen business and to assist in straightening out Pirtle accounts. He testified Rebsamen has lost a little over $11,800 in accounts taken by Milton. Milton's answers to interrogatories indicated he had solicited 35 of Rebsamen's accounts, and has written 29 accounts. They were all former clients of Rebsamen. He testified 53 Rebsamen employees have signed a contract identical to the one signed by Milton. He stated Rebsamen writes insurance in all 75 counties in Arkansas. He testified Milton had not written enough insurance to earn his base salary of $14,000. He also testified uncollected premiums on insurnace Milton had written amounted to more than $3,400 in bad debts to Rebsamen.

Milton testified in his own behalf that Garrison had told him he had done a good job and had approximately $5,000 bonus coming. He said he was making a list to determine the money that was earned on the business he had worked on. He

said he was going to present the list to Rebsamen to show them that he felt like the money he had earned was valid. He also said he was making a list of accounts which resulted from Rebsamen's purchase of the Pirtle agency. Milton stated he felt like he understood the contract he signed but by October 8 decided it might not be a valid contract. Milton testified from his own memory he knew when customers of Rebsamen had insurance policies which were about to expire. He testified he solicited them directly. Milton handed Rebsamen's attorney a list of present customers of P & M which consisted of fourteen names that were identified as customers of Rebsamen Insurance at the time of Milton's termination from his employment. Milton alleged Rebsamen retained a folder containing personal information such as his income tax returns. Milton counter-claimed for $10,000 damages for interference with his peace of mind.

Wade Bratton testified on behalf of Milton. He said he had signed an employment contract with Rebsamen in 1973. He said he did not believe Milton had received any special training or any sort of unique insight from Rebsamen.

James Turner testified he manufactured file folders for Rebsamen but there is no copy-right on Rebsamen's folders.

Stanley McNulty, Jr. testified he had been an insurance agent for twenty years but had never had his agents sign an employment contract. He said he was familliar with Louise Marrs (who had presented a course to Milton at Rebsamen) and did not consider her training as being trade secrets. He testified further the collection methods he used are not a trade secret. He testified he had looked over Milton's employment contract and in his opinion considered it very restrictive. He further stated he would not want Rebsamen coming in and spending a month looking through his files, but he didn't believe Rebsamen would have an advantage over him because of such endeavor.

The enforceability of a covenant not to compete depends upon its reasonableness in light of the particular facts of the case. The reasonableness of a covenant not to compete will be decided on an ad hoc basis. *McLeod* v. *Meyer*, 237 Ark. 173,

372 S.W. 2d 220 (1963). Generally, the employer must meet these three requirements: (1) the employer has a valid interest to protect; (2) the geographical restriction is not overly broad; and (3) a reasonable time limit is given.

Rebsamen cites *Borden, Inc.* v. *Huey*, 261 Ark. 313, 547 S.W. 2d 760 (1977). There the contract provided Huey would not engage in competitive business for one year in only four county seats, which had a total population of 1.3 percent of the total population of the state's 1970 population. The Court found the territorial restriction to be reasonable. Also the Court found the one year limitation to be reasonable.

In dismissing Rebsamen's complaint for permanent injunction and damages the learned Chancellor stated:

> However, there are two areas in which this case is distinguishable from *Borden Inc.* v. *Huey.* First, Milton worked for Rebsamen less than ten months. Secondly, the testimony reflects that much of Milton's time was spent in office and detail work in organizing and straightening out Pirtle's business and in collections. This precluded Milton from having any significant amount of time to build up a personal relationship with customers so as to bind customer loyalty to himself instead of the agency. . . .

> (5) The Court finds that the provisions of paragraph 5 (of the employment contract) are much broader than necessary to protect plaintiff's legitimate business interests in this particular case and are unreasonable. Therefore, the contract is against public policy; unenforceable and void.

Milton testified he took no information with him in writing, removed no information on any of Rebsamen's clients concerning policy coverages, expiration dates etc. This testimony was uncontradicted. The Chancellor was in a position to observe the witnesses and make a factual determination based upon their testimony. The record is replete with contradictory testimony regarding the value of the information gained by Milton. The Chancellor determined Milton

possessed no information or special training which Reb-samen had an interest in protecting.

We find Rebsamen has failed to prove they have a valid interest to protect. They have failed to prove possession of trade secrets in its business. Nor have they proven Milton took any business assets with him upon termination of his employment. Further, Rebsamen has not proven Milton has become possessed of any secret formula, method or device that gives him an advantage over Rebsamen or any other insurance agency. A business cannot use a covenant not to compete to eliminate competition. "An employer cannot use this type of contract as a subterfuge to rid himself of a possible future competitor." *Bailey* v. *King*, 240 Ark. 245, 248, 398 S.W. 2d 906 (1966).

In *McCumber* v. *Federated Mutual Implement and Hardware Insurance Co.*, 230 Ark. 13, 320 S.W. 2d 637 (1959), a restrictive covenant prohibiting an insurance agent from competing for a period of two years upon the termination of his employment was held unenforceable. Since no trade secrets were involved, the employer was held to have no interest which could be protected by restrictive covenants.

We find from the record the employment contract's provisions are broader than necessary to protect Rebsamen's legitimate business interests in this particular case and are unreasonable. Having found the employer has no valid interest to protect, we need not discuss the remaining two requirements. The contract is against public policy, unenforceable and void.

Affirmed.

WRIGHT, C.J. concurs.

HOWARD, J. and NEWBERN, J. dissent.

HAYS, J. not participating.

ERNIE E. WRIGHT, Chief Judge. I agree with the majority in affirming this case. However, I disagree with the holding

that appellant has no valid interest to contractually protect by reasonable restrictions against an employee engaging in competition. It is my view the employer's list of policy holders and expiration dates are proper subject matters to be protected against unfair competition. It is my opinion, however, the contract in this case restricting the employee from soliciting or accepting any insurance business or other business in which the employer is engaged, from any customer of employer or from any person who has been a customer at any time within 3 years prior to the employee's severance, for a period of two years following termination of the employment, is too broad. The contract would prohibit the employee from doing business with the employer's customers, both present and past, even though the business might come to the former employee through means entirely independent of any information gained by the employee in the course of his employment. Also, the contract provides no geographical limitations as to the area in which the employee is prohibited from competing.

The contract is unduly restrictive, unreasonable and therefore void.

DAVID NEWBERN, Judge, dissenting. I agree with the majority opinion only to the extent of saying that each contract containing a covenant not to compete must be reviewed to determine its reasonableness based upon the context in which it is found. I find the covenant in this case completely reasonable.

The majority refers to the distinctions found by the chancellor between the facts in this case and those in *Borden, Inc.* v. *Huey*, 261 Ark. 313, 547 S.W. 2d 760 (1977). While the chancellor referred to the fact that Mr. Milton had worked for Rebsamen less than ten months and that his time was spent in the office and detail work and not with the customers, I find this distinction to be meaningless. A major factor in Rebsamen's concern, and a major interest it seeks to protect, is the office routine or system with which Mr. Milton was intimately involved during the period of his employment.

The majority makes too much of its inability to find that

"trade secrets" had been divulged to Mr. Milton. This emphasis upon "trade secrets" apparently comes from *McCumber* v. *Federated Mutual Implement and Hardware Ins. Co.*, 230 Ark. 13, 320 S.W. 2d 637 (1959), in which our supreme court said: "This case involves neither the sale of a business, nor an employment having trade secrets; so cases of those situations are not applicable." The *McCumber* case does not pose a requirement that there be divulgence of "trade secrets" to hold a covenant effective, but that is merely one factor to be considered. To say the employment involved no "trade secrets" is not equivalent to saying the employer had no interest to protect. To me it is obvious that management or sales systems, which may not rise to the dignity of "trade secrets" may require protection such as was sought by the covenant in this case.

I agree that an employer should not be allowed to use the covenant not to compete as a tool to "rid himself of a possible future competitor." However, I find no evidence whatever of any "subterfuge" on the part of the employer in this case. In *Bailey* v. *King*, 240 Ark. 245, 398 S.W. 2d 906 (1966), which provides the impetus for the majority's expression of that thought, I find, immediately preceding the sentence quoted by the majority the following words:

> Of course, if an employer obtained an agreement of this nature from an employee, and then, without reasonable cause, fired him, the agreement would not be binding. [240 Ark. at 248.]

In that case, our supreme court upheld a contract provision that an employee could not engage in the linen supply business for a period of one year within a radius of 25 miles of the city of Fort Smith, saying that agreement was reasonable.

The other case cited by the majority which bears further discussion is the *McCumber* case which was cited above. There, the contract of an insurance salesman provided that upon termination of his employment, he would not engage in or be in any way connected with the fire, casualty and accident and health insurance business in the territory assigned to or worked by him under his contract with the employer

within a period of two years following termination of his employment. The supreme court said: "The local agent [which was the position of the employee in question] solicits business; but in servicing the policyholder the local agent is little more than a messenger boy between the policyholder and Division Office." It was clear that the employee there was not in the least involved with or exposed to any of his employer's management techniques which might have been considered a protectable interest. Another very important distinction between this case and *McCumber* is that here the agreement prohibited the employee only from:

> Either directly or indirectly, individually or as agent, engage[ing] in the business of soliciting or accepting any insurance business or other business in which the employer is engaged, *from any customer or account of employer which is at the time of severance a current account, or which has been a customer at any time within three years prior to such severance."* [Emphasis added.]

Unlike the clause found in the contract in the *McCumber* case, this clause does not prohibit the employee from engaging in the insurance business altogether in any geographical location or at any time. It provides only against dealing with persons who are or have been customers of the employer within the past three years. To me this seems a less burdensome restriction than the one approved in *Bailey* v. *King, supra*, and certainly much less burdensome than the one disapproved in the *McCumber* case.

I fear the majority's misconstruction of our supreme court's cases, albeit in an area of ad hoc decision-making, may make it virtually impossible for an employer and employee to enter an agreement which purports to protect the legitimate interest of an employer in not having his efforts turned to his disadvantage. Just as an employer should not be allowed to use such a covenant to eliminate prospective competitors through subterfuge, an employee should not be allowed to use a subterfuge which preys upon judicial distaste for such covenants in a way that would permit him or her to take sharp advantage of an employer by taking a job with the design of learning an employer's practices so they may

thereafter be used against him. Here we have evidence of neither of these "subterfuges." The question is the basic one of reasonableness of the requirements of the covenant. I find it reasonable.

HOWARD, J., joins in this dissenting opinion.