Jerry ALLEN *v.* JOHAR, INC.

91-275                                     823 S.W.2d 824

Supreme Court of Arkansas
Opinion delivered January 21, 1992

*Killough, Ford & Hunter*, by: *S. Kyle Hunter*, for appellant.

*Butler Hickey & Long*, by: *Fletcher Long, Jr.*, for appellee.

TOM GLAZE, Justice. This is a trade secret case. Johar, Inc., appellee, is in the business of grinding extruded rubber into handgrips for sporting equipment, motorcycles and tools. After working for Johar for approximately nine years, mostly as a sales manager, appellant, Jerry Allen was fired. Immediately afterwards, the appellant began developing two grinding machines that would allow him to compete with Johar. Mr. Flowers, a long-time maintenance man for Johar also went to work for the appellant. At the time the appellant left Johar, Johar claimed that files and lists containing customer names and other information were missing. Appellant admitted to having contacted as many as ten of Johar's customers, but denied taking any information from Johar's premises.

Johar filed suit alleging that the appellant had used confidential information in designing his production machines and in contacting Johar's customers, and sought to enjoin the appellant's actions.[1] The chancellor found that the design and process of Johar's machines and customer lists were protected by the Arkansas Trade Secret Law and enjoined the appellant from using his production machines or Johar's customer lists. Appellant was ordered to dismantle his production machines. Further, the appellant was enjoined from contacting any of Johar's current customers for eighteen months from the date of the judgment.[2] The appellant appeals arguing that the chancellor erred in ruling that Johar's machines and customer lists were protected under

---

[1] We note that a noncompetition agreement was mentioned in Johar's complaint, but that agreement was not the basis of the chancellor's holding and was not included in the record before us. Therefore, we will not consider this agreement in our ruling.

[2] Appellant counterclaimed for two weeks salary and three weeks paid vacation. The chancellor granted the appellant's claim for his salary, but denied the vacation time. The counterclaims are not at issue in this appeal.

Arkansas Trade Secret Law. We find no merit in the appellant's arguments and therefore affirm.

Under the Arkansas Trade Secret Law, a trade secret is defined as the following:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value for its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4) (Repl. 1991). Under Ark. Code Ann. § 4-75-604(a), actual or threatened misappropriation of a trade secret may be enjoined, which in pertinent part is defined as the following:

> (B) Disclosure or use of a trade secret of another without express or implied consent of a person who: . . .
>
> (ii) At the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was: . . .
>
> (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .

Ark. Code Ann. § 4-75-601(2).

In ruling that the Johar's machines were protected under these provisions of the Arkansas Trade Secret Law, the chancellor made detailed findings comparing Johar's and the appellant's machines based upon the testimony and the chancellor's own viewing of the machines. Johar had entered the handgrip business by purchasing two production machines from a company in California. While these machines in their present form were capable of producing the rubber handgrips, Terry Vienna, the president and owner of Johar, decided to redesign the machines to

make them more productive, and therefore more competitive. Dave Archer, an employee of Johar knowledgeable in industrial engineering, was in charge of the redesigning process. In this process, the main components were relocated—the grinding stone was placed in the middle with a mandrel and table on each side. The location of a mandrel and table on each side of the grinding stone gave Johar's production machines dual capacity and the ability to produce twice as many handgrips. Archer also made other refinements to the machines for Johar including eliminating dust build-up, easing the raw material loading process, and ensuring accuracy in the sizing procedure.

According to Terry Vienna, Johar developed the "dual capacity" production technology in the late 1970's. The appellant argued that Johar had not developed new technology because another company, Halstead Industrial Products Corporation, also had a dual capacity machine with characteristics very similar to the Johar machine. However, the record showed that Halstead got out of the business in the 1980's and sold its machines to Cal-Tackle, which in 1980 or 1981 offered to sell these machines to Johar. Dave Archer testified that Johar decided not to buy the machines because they were not useful to the company. Further Archer testified that the Cal-Tackle machines were not similar to Johar's redesigned machines.

The chancellor found that the appellant's new production machines were very similar to the Johar's machines — same size, same cutting apparatus and sliding tables, and same double-sided process. In sum, while the Allen machine has larger electrical motors and several new safety features that were not on the Johar machines, the Allen machine was the same in design, mode and method of operation for cutting the finished product, for loading and holding raw material for processing, and for sizing the product. Further, the Allen machine was built by Mr. Flowers, who previously worked for Johar with Dave Archer servicing Johar's machines. While working for Johar, Archer became a part owner of Amcorp, and Flowers also worked for Amcorp. Mr. Flowers testified that his knowledge about designing production machines came from his employment with Amcorp and not from Johar. However, Archer testified that, while Amcorp built a machine for Johar under contract, the technology for that machine was Johar's. Thus, the evidence in

the record clearly establishes that Johar's machines fit under the definition of trade secret in Ark. Code Ann. § 4-75-601(4).

We also find support in the record for the chancellor's finding that Terry Vienna met the secrecy requirement under the trade secret law. Vienna testified that like his other competitiors, he did not allow tours of the building. Further, evidence showed that this is a very competitive business because there are a limited number of companies involved, three or four major companies and only two minor companies. In short, we cannot say that the chancellor was clearly erroneous in finding that Johar's production machines are protected under the Arkansas Trade Secret Law.

In the second issue, the appellant argues that the chancellor erred in protecting Johar's customer lists under the Arkansas Trade Secret Law. We do not agree. While this court has addressed the protection of customer lists in prior cases, these cases were decided prior to the passage of the Arkansas Trade Secret Law, and thus those holdings were based on the common law remedy for trade secrets. *See Witmer* v. *Arkansas Dailies, Inc.*, 202 Ark. 470, 151 S.W.2d 971 (1941); *El Dorado Laundry Co.* v. *Ford*, 174 Ark. 104, 294 S.W. 393 (1927). The Arkansas Trade Secret Law was enacted in 1981 and is a uniform law.

There are a host of cases from other jurisdictions that hold that customer lists are trade secrets. *American Credit Indemn. Co.* v. *Sacks*, 262 Cal. Rptr. 92 (Cal. 1989); *Michels* v. *Dyna-Kote Industries, Inc.*, 497 N.E.2d 586 (Ind. Ct. App. 1986); *Minuteman, Inc.* v. *Alexander*, 147 Wis. 2d 842, 434 N.W.2d 773 (1989); *see generally*, Annotation, *Customer List As Trade Secret—Factors*, 28 A.L.R.3d 7 (1969). Generally, customer lists obtained through use of a business effort, and the expenditure of time and money that are not readily ascertainable and are kept confidential are given protection as a trade secret. Annotation, 28 A.L.R.3d 7. In the present case, Vienna testified that it has taken Johar since 1974 to accumulate its customers, and that Johar's customer lists and files contain detailed information about its customers — personality traits, hobbies and likes, credit history, buying habits and pricing agreements. Vienna testified that it would take two to three years of work for a company to obtain this kind of information.

In *Hi-Line Elec. Co.* v. *Moore*, 775 F.2d 996 (1985), the

eighth circuit addressed whether customer information of an industrial supplier of electrical parts and supplies was a trade secret. In that case, the former employee served customers from a stocked van and developed about 75-80% of the customers himself. When the former employee quit, he started his own business and called on many of the same customers he had serviced as sales representative for the appellant. The federal court held that the customer information was not a trade secret because it was readily ascertainable. In the present case, however, the users of Johar's product are not easily ascertainable. Vienna testified that it took years of trade shows and many subscriptions to magazines for Johar to accumulate a customer list. Further, unlike in *Moore*, appellant made no showing that he had developed the customers.

■ As previously discussed, an important factor in determining whether a customer list is a trade secret is whether the employer took actions to guard the secrecy or preserve the confidentiality of the list. Annotation, 28 A.L.R. 3d 7. In this respect, the record supports the trial court's finding that Johar kept its customer lists and files confidential. Vienna testified that the information was kept confidential and was not to leave the premises. Further, he testified that he ordered old customer printouts destroyed. The evidence, we conclude, clearly supports the chancellor's holding that Johar's customer lists meet the requirements of protection as a trade secret.

■ In so holding, we note that the appellant does not really argue that he should be allowed the use of Johar's customer lists and files in his business. Instead, he mainly challenges the chancellor's holding requiring him to erase from his memory the names of Johar's customers. In other words, the appellant does not admit using Johar's written customer information, but does admit using his memory in contacting ten Johar customers. We believe that whether the customer information used was written down or memorized is immaterial, and the proper issue is whether the information is protectable as a trade secret. J. McCarthy, *Trademarks and Unfair Competition*, § 29:5 (2d ed. 1984). Under the circumstances of this case, it was.

For the reasons stated above, we affirm.

DUDLEY, NEWBERN and BROWN, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. Prior to the adoption of Act 439 of 1981, Ark. Code Ann. § 4-75-602 (1987), we defined a "trade secret" as "secret formula, method, or device that gives one an advantage over competitors." *Rector-Phillips-Morse* v. *Vroman*, 253 Ark. 750, 489 S.W.2d 1 (1973); *Miller* v. *Fairfield Bay*, 247 Ark. 565, 446 S.W.2d 660 (1973). That definition was too narrow to include a customer list. In *Orkin Extermination Co., Inc.* v. *Weaver*, 257 Ark. 926, 521 S.W.2d 69 (1975), we made it clear that a customer list was not a trade secret. Our discussion of the two matters in that case was appropriately separated.

The enactment of § 4-75-602 revised the definition of "trade secret," and provided, in subsection (4):

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable from proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

In *Girard* v. *Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 525 (1985), the Arkansas Court of Appeals, without referring to the Statute, continued to consider protection of a customer list separately from protection of a trade secret. The Court wrote, "While we agree with appellant that no trade secrets were shown to exist in appellee's business, the appellee's proof did show that its customer list and related information were protected interests."

Since the decision in the *Girard* case, the Court of Appeals has continued to refer to trade secrets and customer lists in the disjunctive, and as if they were completely separate subjects. *See Federated Mut. Ins. Co.* v. *Bennett*, 36 Ark. App. 99, 818 S.W.2d 596 (1991); *Duffner* v. *Alberty*, 19 Ark. App. 137, 718 S.W.2d 111 (1986).

Against this background, we are called upon for the first time to interpret the statutory language. Has it elevated to the status of "trade secret" the customer list previously protected only by the common law of unfair competition? I have no doubt a customer list is a "compilation" of "information," thus satisfying the general requirement of § 4-75-602. Nor do I doubt that in this case there is substantial evidence that Johar, Inc., expended "efforts that are reasonable under the circumstances to maintain its secrecy," with respect to its printed customer list, thus satisfying subsection (B). I question, however, whether Johar took reasonable efforts to protect secrecy of the list maintained in Allen's mind.

The majority opinion notes that reference was made in the Trial Court to a noncompetition agreement but that we do not have it in the record before us and it is not a part of this appeal. It seems to me that the only reasonable effort an employer can make toward keeping the names of its customers secret is to contract with its employees not to reveal those names and not to compete for a reasonable period should the employment end.

A noncompetition agreement in these circumstances is a standard device; however, I believe it should be written by the parties and not by the Chancellor. To hold that a memorized customer list is protected as a "trade secret" will, I believe, lead to problems which could be avoided if the holding were limited to lists in writing.

To say that the list in this case is a trade secret but to be protected only for 18 months raises the question whether it is not, thereafter, a trade secret. Why does it cease to fulfill the statutory definition after that period has passed? Again, it seems to me that the Chancellor has simply written an agreement for the parties. In *Rector-Phillips-Morse* v. *Vroman, supra*, this Court held the covenant not to compete placed unnecessary restrictions upon Vroman, and it was found to be invalid. At the request of the appellants, this Court declined to rewrite the contract to make it valid. We wrote, "Our rule is that when a restriction such as this one is too far-reaching to be valid, the court will not make a new contract for the parties by reducing the restriction to a shorter time or to a smaller area." *See also Federated Mut. Ins. Co.* v. *Bennett, supra.* This Court further wrote that to adopt a doctrine

whereby the court is allowed to write an agreement for the parties "would confer upon the courts the power to make private agreements, a matter certainly not within the judicial province as it has been traditionally understood in our law." *Rector-Phillips-Morse* v. *Vroman, supra.*

I would hold that a customer list is not protected under the Statute except as a written document. The only reasonable effort an employer can make to protect a list not in writing is to enter an agreement with the employee. If such an agreement exists, it may raise the memorized customer list to the level of a trade secret, but it should be protected only to the extent of the agreement between the parties for two reasons. First, in no event should the information be protected as a trade secret in perpetuity because that would violate the same public policy against restraint of trade we have declared to control noncompetition agreements. *Hyde* v. *C M Vending Co.*, 288 Ark. 218, 703 S.W.2d 862 (1986); *Evans Laboratories* v. *Melder & Cingolani*, 262 Ark. 868, 562 S.W.2d 62 (1978); *Federated Mut. Ins. Co.* v. *Bennett, supra; Rebsamen Ins.* v. *Milton*, 269 Ark. 737, 600 S.W.2d 441 (Ark. App. 1980). Second, by entering a reasonable noncompetition agreement, the parties will supplant the protection of the trade secret Statute.

I respectfully dissent.

DUDLEY and BROWN, JJ., join in this dissent.