866 F.Supp. 1150 (1994)
VIGORO INDUSTRIES, INC., Plaintiff,
v.
CLEVELAND CHEMICAL COMPANY OF ARKANSAS, INC.; James M. Sanders; Michael W. Sanders; Kenneth Crisp; Margie L. Aaron; Elsie D. Bartlett; Larry B. Bearden; Dennis E. Cavette; David A. Puckett; Tommy R. Reeves; Louis Sain; Don Scarbrough, Jr.; Shedrick H. Smith, Jr.; Houston Snyder; Syd D. Snyder; and Donald R. Washburn, Defendants.
No. LR-C-93-672.
United States District Court, E.D. Arkansas, Western Division.
November 4, 1994.
*1151 *1152 *1153 *1154 Amy Lee Stewart, Rose Law Firm, Little Rock, AR, Roger W. Wenthe, Byron L. Gregory, McDermott, Will & Emery, Chicago, IL, for plaintiff Vigoro Industries Inc.
Alston Jennings, Wright, Lindsey & Jennings, W. Russell Meeks, III, Meeks & Carter, P.A., Little Rock, AR, for defendants Cleveland Chemical Co. of Arkansas, Inc., James M. Sanders, Michael W. Sanders.
David Solomon, Helena, AR, for defendants Kenneth Crisp, Margie L. Aaron, Elsie D. Bartlett, Larry B. Bearden, Dennis E. Cavette, David A. Puckett, Tommy R. Reeves, Louis Sain, Don Scarbrough, Jr., Shedrick H. Smith, Houston Snyder, Donald R. Washburn, Syd D. Snyder.
W. Russell Meeks, III, Meeks & Carter, P.A., Little Rock, AR, for movants Jimmy Sanders Seed Co., Sanders Elevator Co., Cleveland Chemical Corp.

MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW
EISELE, District Judge.
This matter having been tried to the Court August 15-22, 1994, the Court makes the following findings and legal rulings regarding the liability of the remaining defendants in this case, Cleveland Chemical Company of Arkansas ("Cleveland Chemical"); James M. Sanders; Michael W. Sanders (hereinafter, Cleveland Chemical, James and Michael Sanders are collectively referred to as the Cleveland Defendants); Kenneth Crisp, Dennis E. Cavette, Don Scarbrough, Jr.; and Donald Washburn. The Court notes that the other named Defendants in this lawsuit were voluntarily dismissed by the Plaintiff at the conclusion of its case-in-chief.
At first blush, this case appears to present the prototypical situation that legal theories such as conspiracy, breach of fiduciary duty, intentional interference with contractual and prospective business relationships, and misappropriation of trade secrets were intended to remedy. The scenario suggested by the plaintiff's Complaint and pre-trial briefs conjures up images of ruthless corporate raids. A long-term general manager walks out on his employer and takes every single employee with him. The employees, enticed by the general manager and his prospective employer, flock into the waiting arms of a new business, owned by one of the old employer's previous wholesalers, which is conveniently set up only a few yards down the road from the original employer. The competitor, aided by the employer's former employees, is poised to immediately compete at great advantage with the former employer. Compete the competitor does, and when the dust settles, the competitor has acquired seventy percent of the employer's former business. And it is plaintiff's contention that all of this occurred as a result of a pernicious scheme by and among the defendants to intentionally destroy its business.
But when one gets beyond the pleadings and pre-trial submissions and into the facts, the case looks much different. After listening to the testimony in this case, the Court has determined that most of the explanations for this occurrence do not involve violations of the law. In the eyes of this Court, much of this case is best explained by human nature, market realities, and our society's changing work environment in which loyalties to any one business entity are rapidly disappearing due in part to the extensive use of "at-will" contractual arrangements. Employers want to retain their good employees, but they often do not wish to provide the secure benefits of extended-term employment contracts or to incur the increased detriments occasioned thereby, in order to better insure such loyalty. Consequently, the current reality is that most employees will work for many employers over their lifetime in the workforce. They will move from one employer to another based on their real or perceived best self-interest, responding to incentives of better pay, better security, better fringe benefits, better working conditions and better future prospects.
When Vigoro entered the scene in 1986, Kenneth Crisp and a large portion of the Marvell employees met their third owner-employer since 1970. True, Crisp and the other employees were performing virtually the same jobs in the identical location under all three employers. Their employer, however, *1155 and certainly to some degree their job security, had changed again. Vigoro chose to employ Crisp and all of the other Marvell employees on an at-will basis. Accordingly, those employees had no right to continued employment and could be fired at any time. (Pl.'s Exh. 3, Employee Handbook).
Vigoro acquired the Marvell Farmarket from LaRoche Holdings in 1986 by purchasing the assets of the Farmarket. The purchase agreement from LaRoche included a total of 24 Farmarkets located in nine states. LaRoche Holdings had previously purchased the Farmarkets from U.S. Steel.
The Court makes the following additional findings of fact:

The Vigoro Marvell Farmarket
The nature of the business entity known as the Vigoro Marvell Farmarket and the nature of the community in which it operated are critical to an understanding of the legal issues presented in this case. Vigoro's Farmarket is based in Marvell, Arkansas, which is located in Phillips County. Marvell is a small community, with a population of approximately nine hundred (900) people. The economy is based primarily on agriculture. Vigoro, through the Marvell Farmarket, serves the needs of the farmers in the area by selling them primarily fertilizer, insecticides, other chemicals, and seeds at the retail level. Prior to the exodus of Kenneth Crisp and the other twelve employees, all of whom were named as defendants in this lawsuit, the total number of farmers that Vigoro could claim as customers equalled less than two hundred. These farmers were concentrated in a twenty-five to fifty-mile radius of the Marvell Farmarket. It appears that thirty-five to forty of the Marvell Farmarket's customers accounted for over 70% of its sales.
Mr. Crisp and the three salespeople, Cavette, Scarborough, and Washburn, were the principal contacts with the farmers. All four had lived in the Marvell community all or most of their lives. All had farmed and had close friends and relatives who farmed in the area. It can be said that they had a life-long association with the great majority of the customers they served.
Mr. Dennis Cavette started work with a predecessor organization in 1976 and became a full-time salesman in 1984, two years before Vigoro took over. Before coming to work for Mr. Crisp in 1976 he had worked for Farmers Supply Co., a competitor. In that job he also took soil samples for farmers. His wife's brother and uncle are active farmers in the area.
Mr. Don Scarborough did not join the Marvell Farmarket until 1990. However, But he had lived in Marvell since he was five years old and "knew everybody" in his sales territory.
Mr. Ray Washburn started working full-time for Vigoro in 1987. He replaced Mr. Ronnie Cox as a salesman in 1988 and took over his sales territory. Before coming with Vigoro he was employed by the Arkansas State Plant Board as a field representative. It was part of his job as a field representative to check feed and fertilizer samples taken from companies operating in Phillips County and parts of Monroe County. His father farmed south of Marvell.
Mr. Crisp operated Vigoro's most successful Farmarket operation. He was greatly respected by his subordinates, his superiors at Vigoro, and the farmers in the area. He was frequently called upon by his superiors to explain the keys to his success to others in Vigoro's large Farmarket operation.
Shortly after Vigoro acquired the Marvell Farmarket in 1986, Mr. Crisp became dissatisfied and decided to resign. However, Mr. Seaton, who was Vigoro's president at the time, asked Crisp to hold off until they had an opportunity to talk. At their meeting, Vigoro made concessions to Mr. Crisp in order to keep him from leaving, including a modification of its incentive plan that made it more favorable than those in place in Vigoro's other Farmarkets. The Court finds that Mr. Crisp also carefully explained his personal interests in an aerial application service and in a trucking business. And he explained how his salespeople were permitted to supplement their incomes from Vigoro by providing scouting services to the farmers. There was full and complete disclosure by Mr. Crisp, and acceptance by Vigoro, of all such potential conflicts of interest.
*1156 The retail farm supply business in which Vigoro's Marvell Farmarket was engaged was highly competitive during the tenure of Crisp, Cavette, Scarborough, and Washburn, and it remains so today. Prior to the opening of Cleveland Chemical's store, Vigoro had three principal competitors in the immediate area. The farmer-customers in the market made, and make, their purchasing decisions based on their perceived best self-interest. Price and service were, and are, the key factors. Personal loyalties and friendship are secondary except where price and service are essentially the same amongst competitors. Part of the service farmers sought from Vigoro was the advice and suggestions of experienced salespeople. Vigoro, like its competitors, not only sold fertilizers, seeds, and chemicals, it also provided buggies and applicators which the farmers used. And Vigoro's salespeople would obtain soil samples at the request of the farmers and send them in for analysis at no cost to the farmers. And at a modest cost of $4.00 an acre, Vigoro's salespeople would scout the farmers' land for insects and pests.

Events leading up to Crisp's decision to leave Vigoro and go to work for Cleveland Chemical
Allen Morgan, a Vice-President for Cleveland Chemical Company, testified that he would occasionally accompany a salesman from Cleveland Chemical on visits to the Marvell Farmarket. The Marvell Farmarket purchased chemicals at the wholesale level from Cleveland Chemical Company. Mr. Morgan became acquainted with Kenneth Crisp during these visits, which began in 1975 and continued until 1992. Mr. Morgan testified that during the fifteen years he spent in Wynne, Arkansas, before moving to the Cleveland office, he became familiar with Kenneth Crisp's reputation for excellence in the field. Regarding Crisp's abilities, Morgan stated:
I think that he has got good work ethic, you know, he has got a lot of knowledge of agronomic, fertilizer, seed, and chemical, and he has got a lot of personality that brings it across to people in a very, very special way, and he is able to put together sales based on all of those things.
(Morgan, Tr. Vol. III at p. 176.)
Mr. Morgan testified that the first conversation that he had with Kenneth Crisp about Crisp's interest in joining Cleveland Chemical occurred in late 1986 or early 1987, during the period that Vigoro was purchasing the Marvell Farmarket from LaRoche. Mr. Morgan testified that during that conversation, which occurred at a local restaurant, Crisp expressed his frustration at being "sold again" and stated that he might be interested in doing something else. Morgan testified that Crisp inquired whether Cleveland Chemical would be interested in either supporting him at a dealership or being involved with him. Morgan was interested, and he stated that he reported this conversation back to Jimmy and Michael Sanders. Nothing further came of this conversation, however, and Cleveland Chemical made no efforts to follow up with Crisp.
The next conversation about the possibility of Crisp coming to work for Cleveland Chemical occurred in the fall of 1992. Mr. Morgan testified that Mr. Crisp either contacted him by phone or sent word through a salesman that he was interested in talking to Cleveland Chemical. Mr. Morgan testified that this conversation was basically a reiteration of what occurred during the late 1986 or early 1987 conversation. Mr. Crisp again expressed his interest in the possibility of joining Cleveland Chemical. Mr. Morgan described the conversation as follows:
Q. What is the primary reason for the meeting in the pickup truck: the possibility of Mr. Crisp joining Cleveland Chemical?
A. I think it was to let me know that he had an interest.
Q. And did he talk to you at all about the reason why he was interested in leaving Vigoro?
A. Did not really say anything, you know, derogatory about Vigoro at that point. As a matter of fact, he hasn't since as far as I can tell.
*1157 (Tr., Vol. III, p. 35). Crisp disclosed no information about the Vigoro Farmarket in that conversation.
The next conversation occurred sometime in October of 1992, when Crisp and Morgan met in Marvell and drove to Crisp's duck club. They discussed what Crisp would need in the way of facilities, rolling stock, inventory, and working capital if he were to come to work for Cleveland Chemical. Morgan indicated to Crisp during this meeting that the Messrs. Sanders were interested. Morgan testified that he got the impression during this meeting that Crisp was interested in trying to bring some of his employees with him if he came to work for Cleveland Chemical. (Tr. Vol. III, p. 40).
Crisp traveled to Cleveland, Mississippi in November of 1992 to meet with Morgan and the Messrs. Sanders at the latter's request. The four met in Cleveland Chemical's offices for about two hours. The discussion centered on business. Crisp predicted that the dealership that he was talking about putting in, whether it was with Cleveland Chemical or himself, should do $5 to $6 million in sales the first year. Crisp indicated that he was dissatisfied with Vigoro due to the way it was calculating his incentive payments and because he felt that it was not fully committed to its business in his area based on its failure to provide the facilities and support that Crisp felt were needed.[1] Beyond this, the Vigoro Farmarket was not discussed during this meeting. Rather, the discussion centered on the general needs of Phillips County, the target market. Crisp did not bring any written materials with him. During the meeting, Crisp identified what equipment he would need. The meeting ended with Morgan and the Messrs. Sanders telling Crisp that they would think about the possibilities that Crisp had presented.
Later in November, Morgan contacted Crisp and the two met in West Helena, Arkansas. Morgan told Crisp that if he in fact left Vigoro, Cleveland Chemical would be interested, that is, Cleveland Chemical would provide the facilities, equipment and finances for the endeavor. Crisp replied that he would let Cleveland Chemical know if he decided to do anything. In December, Crisp contacted Morgan to report that he had decided to stay with Vigoro.
The next contact that Crisp had with Cleveland Chemical regarding the possibility of his joining Cleveland Chemical occurred in May of 1993. Kenneth Crisp telephoned Morgan and stated that "he thought now was the time to do something." (Morgan, Tr., Vol. p. 58). After checking with the Messrs. Sanders, Morgan contacted Crisp to let him know that if he left Vigoro, Cleveland Chemical would be interested in going into business with him.
Later in May, Morgan and Crisp met to discuss more specific preparations for the new enterprise. At this point, they began to discuss, and attempted to pinpoint, the actual cost of facilities and equipment. Morgan testified that his plan was to open the business in time for the fall fertilizer season. During this meeting, Crisp committed to leave Vigoro and come to work for Cleveland Chemical. After this meeting, Crisp and Morgan communicated on a fairly regular basis to discuss the ongoing effort to acquire the necessary equipment. At some point during late May or early June, while discussing the site for the new enterprise, Crisp told Morgan about the property that he, Crisp, had purchased back in February of 1993. Morgan testified that Crisp was going to get to pick the site anyway. Morgan agreed that Crisp's property was a suitable location, and Morgan, on behalf of Cleveland Chemical, entered into an agreement with Crisp to purchase the land once Crisp resigned from Vigoro. Morgan testified, however, that Cleveland Chemical was not going to spend any money or commit to facilities until Crisp actually resigned from Vigoro.[2]
*1158 Sometime during May, Morgan became aware that Crisp would need approximately ten to fifteen people working full-time and part-time to run the operation. Further, Morgan and the Messrs. Sanders had given Crisp the authority to make all hiring decisions for the new enterprise. The evidence indicated that Morgan knew that Crisp might bring some Vigoro employees with him, but he did not know how many or which ones. The Court finds that Morgan and the Cleveland Defendants did not know that Crisp was going to bring all, or even most, of his co-workers from Vigoro with him until they saw Crisp's letter of resignation shortly after Crisp resigned from Vigoro on July 16, 1993. There is no evidence that these Defendants suggested to Crisp that he attempt to persuade other Vigoro employees to come with him. They left the selection of employees completely in Crisp's hands.
Additionally, the Court finds that Crisp did not approach other employees of Vigoro about their possible interest in going with him to Cleveland Chemical's proposed operation until the eve of his own resignation on July 16, 1993. And the Court credits Crisp's testimony and most of the employees' testimony about the approach that Crisp used. He in effect told each employee that he was leaving and was going to manage a similar operation, and that if the employees wanted to go there would be a place for him or her in the new operation. It is not clear that all of Vigoro's employees had made a firm decision by July 16, 1993, to leave with Crisp, but Crisp interpreted their responses as indicating that they wished to work with him in the new business. Crisp clearly commanded immense loyalty from his salespeople and the other employees. They viewed him as a "winner" and tied their futures to him on a personal basis. Had Crisp waited until August 7, 1993, to first approach Vigoro's other employees, the Court is convinced that, with possibly one or two exceptions, the result would have been the same.
Regarding the timing of Crisp's resignation, the Court finds that it was due in part to Crisp's desire to see that the Vigoro employees, including himself, received their year-end bonuses. It was also keyed to take advantage of the Fall fertilizer season.
No evidence was presented to support a finding that Crisp or the other Vigoro employees took any records, reports, documents or other physical property from Vigoro when they left. The Court finds that the only thing that Crisp and the other employees of Vigoro took when they left Vigoro was essentially what they "had in their heads."
At some point during late May or early June, Crisp gave Cleveland Chemical an estimate of $326,000 for the annual salary and wage expenses for the new enterprise. This amount was approximately the same salary and wage expenses applicable to Vigoro's Marvell operation at that time. Thus, the Court assumes that Crisp took what he knew to be Vigoro's salary and wage expense and judged it to be a reasonable basis for estimating similar expenses which would be incurred by the new enterprise.
Cleveland Chemical purchased Crisp's property, on which the Cleveland Chemical facility in Marvell was eventually built, on July 28, 1993. Cleveland Chemical eventually spent between $900,000 and $1.2 million to open the new facility in Marvell, Arkansas.

Scouting by Vigoro's Salespeople
The proof establishes that Mr. Crisp permitted and encouraged his salespeople to perform scouting services for Vigoro's customers and to supplement their incomes thereby. He felt this practice benefited Vigoro by increasing the abilities of, and the incentive for, his key salespeople to increase their sales. Mr. Crisp's performance provides convincing evidence of his good business judgment in this respect.
His salespeople would charge a farmer approximately $4.00 per acre for this service, which was used almost exclusively by those farmers growing cotton. The salespeople used Vigoro's trucks to haul their own three or four-wheelers to the farm. They paid their helpers and their own expenses out of the proceeds received from the farmers and kept the "profit." Vigoro argues that either *1159 the salespeople should not have performed these services or that they should have remitted the profits to Vigoro. There is no basis for either argument.
First, and fully determinative of this issue, Vigoro knew of this practice from the time it acquired the Marvell Farmarket in 1986. Mr. Crisp carefully explained to his new Vigoro superiors all of his own independent ventures and also this scouting incentive program that he made available to his salespeople. Vigoro officials accepted same and never objected thereto until this lawsuit was filed.
Second, Vigoro has represented to the Court that it would have provided such services free to the farmers. Obviously, if it did so, it would have to pay the expenses and costs thereof. Of course, the farmers may have welcomed such a free service "extra," but there is nothing to suggest that sales would have been improved. Indeed, since the Marvell Farmarket was the best producer and the most profitable in Vigoro's entire Farmarket operation, it is difficult to see any disadvantage that Vigoro suffered as a result of this scouting practice. On the contrary, it is clear that Vigoro benefited financially from this arrangement, which may account for the fact that it did not seek to change it at any time during the eight years in which Mr. Crisp ran its Marvell operation.
Plaintiff's contention that it did not know of this scouting program would, in any event, be difficult to accept. Obviously, Vigoro knows of the value of, and the cost of, providing scouting services to its customers. It would naturally want to assure itself that its Farmarkets were providing such services. And its budgeting and accounting functions would identify the costs thereof. Since no costs for such services were reflected on its books, Vigoro obviously knew that it was not providing such services at its own cost, i.e., free to its farmer-customers. But, here, this issue is not in doubt. The Court credits Mr. Crisp's testimony that the plaintiff was made aware of the program, and accepted it from the beginning.

Crisp's increased purchases from Cleveland Chemical during the last few months of his employment with Vigoro
Vigoro alleges that Crisp, in the months just prior to his leaving Vigoro, improperly caused Vigoro to purchase more products at the wholesale level from Cleveland Chemical than it had in the past. The evidence does indicate that Vigoro, during the six months prior to Crisp's departure, purchased substantially more product from Cleveland Chemical than it had in the past. For example, Vigoro purchased the following amounts of chemicals from Cleveland Chemical from March through July of 1993:

 March $ 331,875.00
 April $ 461,878.28
 May $ 238,833.17
 June $ 97,193.85
 July $ 615,152.26
 August $ 46,771.50
 TOTAL SALES $1,837,206.28

The proof was that Crisp was given full discretion in the making of such purchases on behalf of Vigoro. The testimony of Alan Morgan shows that the increased sales were due at least in part to Cleveland Chemical's decision to offer Vigoro the full national discount on its fertilizer purchases in order to be more competitive. The testimony also indicates that in July of 1993 greater than usual infestation occurred because of heat and moisture. Although it might be possible to show isolated purchases from Cleveland Chemical that, by hindsight, could have been made at less cost from others, no evidence was presented to show that Crisp knew this at the time. Most importantly, no evidence was presented to show that plaintiff was prejudiced overall by these purchases. The Court accepts that Mr. Crisp may have sought to favor Cleveland Chemical more after his May-June, 1993, decision to join that company if he could do so without prejudicing Vigoro's interest. But, the Court also accepts Mr. Crisp's explanation and is convinced that he made these decisions believing them to be in plaintiff's best interest. Indeed, in terms of the manner in which Mr. Crisp performed his managerial duties and carried on the day to day operations of the Marvell Farmarket, he was a loyal Vigoro employee until his departure.

*1160 ANALYSIS

From a policy standpoint, the Court, consistent with existing law, is reluctant to place restrictions on at-will employees that would prevent, or severely limit, them from earning a living in their chosen fields. This principle particularly holds true in today's open and free-wheeling market, in which at-will employees, for a multitude of reasons, choose or are required to work for different employers from time to time. On the other hand, the Court must attempt to protect employers from true breaches of loyalty at the hands of their employees, and from improper or unfair competition or practices at the hands of their competitors. Line drawing obviously becomes important in situations such as this.
There are no restrictive covenants in this case. Given that an employer enjoys less protection in the absence of a covenant not to compete,[3] it would be perverse to allow Vigoro to obtain under the Arkansas Trade Secrets Act or any other law that which it could not obtain with an enforceable contract containing a covenant not to compete.
The observations noted by the court in Fleischhacker regarding restraints on competition bear repeating:
[T]he right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based on competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.
Id. at 1202 (quoting ILG Indust. Inc. v. Scott, 49 Ill.2d 88, 92, 273 N.E.2d 393, 395 (1971)).
Arkansas courts have strictly scrutinized restrictions on competition in employment contracts. For example, in Evans Lab., Inc. v. D.O. Melder, 262 Ark. 868, 562 S.W.2d 62 (1978), the court considered the validity of a contractual provision between the employer, a termite and pest control firm, and its former employee, a routeman who had serviced the employer's customers. The contract prohibited the acceptance of or solicitation of business from customers whom the routeman had previously serviced for a period of two years after the routeman's employment with the employer ceased.[4] The court struck down this restrictive covenant as creating an "undue interference with the interests of the public's right to the availability of a serviceman it prefers to use." Id. at 870, 562 S.W.2d at 64. The court specifically noted that it was reluctant to uphold employment contracts containing "negative provisions ... with reference to future employment elsewhere by the employee." Id. 562 S.W.2d at 63.
With these policy considerations and the factual findings described above in mind, the Court reaches the following conclusions.

I. MISAPPROPRIATION OF VIGORO'S TRADE SECRETS
Vigoro seeks to hold the Cleveland Defendants, Kenneth Crisp and certain of the Marvell employees liable for misappropriating Vigoro's trade secrets. The Court notes that the Arkansas Trade Secrets Act ("the Act"), Ark.Code Ann. § 4-75-601 et seq., is Vigoro's exclusive remedy for the Defendants' alleged misappropriation of Vigoro's trade secrets. The statute specifically "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret" although it does not affect "[c]ontractual or other civil liability or relief that is not *1161 based upon misappropriation of a trade secret." Ark.Code Ann. § 4-75-602. Accordingly, were the Court to determine that the information Vigoro seeks to protect as a trade secret qualified as such, and that the Defendants misappropriated those trade secrets, then Vigoro's exclusive remedy for improper use of that information would be pursuant to the Arkansas Trade Secrets Act. In that situation, Vigoro would not be able to rely on the acts constituting misappropriation of a trade secret to support its other causes of action. That situation does not arise here, however, because the Court concludes that the information that Vigoro seeks to protect as a trade secret is not entitled to protection as such under the Arkansas Trade Secrets Act.
The Act defines a trade secret as follows:
"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process that:
(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can readily obtain economic value from its disclosure or use; and
(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Ark.Code Ann. § 4-75-601(4). Actual or threatened misappropriation of a trade secret may be enjoined. Misappropriation is defined as follows:
(2) "Misappropriation" means:
(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
(i) Used improper means to acquire knowledge of the trade secret; or
(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
(a) Derived from or through a person who had utilized improper means to acquire it;
(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; ...
Ark.Code Ann. § 4-75-601(2).
Vigoro claims that the following types of customer information are protectable as trade secrets under the Act:
1. The fact that the farmer is a customer of the Vigoro Marvell Farmarket;
2. The farmer's history of crops planted, timing of planting, crop rotation schedule, and plans for future planting;
3. The history of Vigoro's product sales to the farmer, which reveals the farmer's preferences for various fertilizer and pesticide products;
4. The farmer's history of having a cotton crop scouted for insects by Vigoro salesmen, which reveals the farmer's willingness to receive and pay for this service and the potential for increasing pesticide services to the farmer;
5. The farmer's history of having soil samples analyzed at Vigoro's expense which, together with the history of fertilizer sales to the farmer, demonstrates the farmer's willingness to have this service performed and his or her willingness to purchase custom-blended fertilizer to treat specific acreage differently depending on their differing nutrient needs; and
6. The farmer's creditworthiness for farm-supply purchases, which determines the amount that can safely be sold to the farmer on credit.
A threshold issue is whether any, all or part of the six categories of information labeled "trade secrets" by the Plaintiff qualifies *1162 as such under the Act. The cases interpreting Arkansas' Trade Secret Act and other states' versions of the Uniform Trade Secrets Act ("UTSA"), on which the Arkansas act is based, are very fact-dependent. In determining whether any particular information constitutes a trade secret, several statutory factors must be analyzed. First, it must be determined if the information has economic value from not being generally known. Then, it must be determined whether the information was not generally known. Next, it must be determined whether the information was "readily ascertainable by proper means." Finally, the Court must ascertain whether the information was subject to reasonable efforts to maintain its secrecy. For the reasons stated below, the Court concludes that the information that Vigoro seeks to protect as a trade secret either does not derive economic value from not being generally known; was in fact generally known; or was readily ascertainable. Additionally, Vigoro failed to take reasonable efforts to maintain the secrecy of the information. For these reasons, Vigoro's claim that its customer information constitutes trade secrets must be rejected.
The Court has already found that neither Crisp nor any of the other Marvell employees took anything in writing from Vigoro when they left. Thus, the "trade secrets" that Vigoro alleges were misappropriated must have existed in the minds of Crisp and the Marvell employees. The Court agrees with Vigoro that the distinction between information which is written down and that which is memorized has little materiality under Arkansas law. The critical issue is whether the information, whether written or memorized, is entitled to protection as a trade secret. Allen v. Johar, Inc., 308 Ark. 45, 50, 823 S.W.2d 824, 827 (1992).
The Court first explores the meaning of the phrase "readily ascertainable." "A finding that the information is readily accessible to competitors indicates that the plaintiff did not reasonably spend a great deal of time or effort compiling that information, and that the plaintiff suffers no injury when a former employee uses the information since he or his new employer could easily discover it from other sources." Surgidev Corp. v. Eye Technology, Inc., 648 F.Supp. 661, 682 (D.Minn.1986) (citations omitted). Further, the Court notes that it is not necessary that Vigoro's customer information be capable of exact and precise duplication in order to be readily ascertainable. "Especially in a market where customers did business with more than one sales company or were open to the possibility of shifting business from one company to another, it is simply unreasonable to construe the [Uniform Trade Secrets] Act's `readily ascertainable' standard as requiring exact duplication of the information on the customer list." Fleming Sales Co., Inc. v. Bailey, 611 F.Supp. 507, 513 (N.D.Ill.1985) (citation omitted).
The Court will address separately some of the pieces of information that Vigoro claims are entitled to protection under the Act.

A. Identity of farmers in the area
In acknowledgment of the fact that the Arkansas Trade Secrets Act protects only information that has independent economic value, Vigoro expressly states that it is not seeking to protect "lists of names of potential customers." (Pl.'s reply trial brief at p. 19.) What Vigoro seeks to protect, in its own words, is "specific information that it has gathered, at tremendous cost, about existing customers it has served for years, which is preserved partly in writing and partly in the memories of Crisp and the Marvell Employees." (Pl.'s reply trial brief at p. 19-20.)
The Court rejects Vigoro's contention that the identity of its customer-farmers in its Marvell market area constituted a trade secret. Vigoro's customer list consisted of fewer than 200 farmers, all of whom were located in Phillips County, Arkansas. More specifically, Vigoro's own witnesses, Mr. Seaton and Mr. Van Patten, testified that the farmers that Vigoro served were located within a twenty-five to fifty-mile radius of the store. For the reasons set forth below, the Court holds that the names of these farmers were "readily ascertainable". A farming enterprise is distinct in appearance. Unlike other occupations which are carried on without visibility from passersby, farmers display *1163 their trade for all to see. Also of importance in this case is the fact that Vigoro's customers were located in a relatively small geographic and population area. These facts make it feasible for any person so inclined to discover the identities of the farmers located in the area simply by visually locating the farming operation, approaching the house or locating someone working the land, and asking questions. Furthermore, the Marvell community is one, like so many small rural areas, where everyone knows everyone else.
The narrow geographic range in which Vigoro's customers are located is a fact that weighs greatly in the defendants' favor. For instance, in Allen v. Johar, Inc., supra, there was testimony on behalf of Johar, whose customer lists were held to be trade secrets, that "it took years of trade shows and many subscriptions to magazines for Johar to accumulate a customer list." 308 Ark. at 50, 823 S.W.2d at 827. One can reasonably infer that Johar's customers were located nationwide or, at a minimum, encompassed more than one state. Surgidev Corp. v. Eye Technology, Inc., supra, involved ophthalmologists located nationwide who implanted lenses manufactured by Surgidev. By this line of analysis, the Court is not trying to imply that customer lists and corresponding information regarding those customers cannot be trade secrets unless the customers are sprinkled across the nation. The location of the customers coupled with their number, however, bears directly on how "readily ascertainable" that information is to competitors. Identifying Vigoro's customers in this context is simply a matter of "see and ask."
Also of interest is the distinction noted by a California court regarding information used in a single transaction, which is typically not entitled to protection as a trade secret, and information which is needed "for continued use by the former employer in order to maintain a competitive advantage over others." Cal Francisco Investment Corporation v. Vrionis, 14 Cal.App.3d 318, 92 Cal.Rptr. 201 (1971) (citing Restatement (Second) of Torts, section 757, cmt. (b) (1979) ("[a] trade secret is a process or device for continuous use in the operation of a business")). Learning the identity of Vigoro's customers is obviously a one-time thing. Once the identity of the farmers is known, their concerns about price and service make them easily approachable, especially by those who might offer a better price or improved service.

B. Soil Sample Analysis
Vigoro alleges that the results of tests of soil samples that Vigoro performed free of charge for its customers are protectable as trade secrets. The testimony was clear that the soil sample tests were performed as a service to the farmers and that the farmers were always given a copy of the results of their soil analysis. Thus, this information, too, was readily ascertainable by simply talking to the farmers, whom the Court has already determined could have been identified with reasonable effort. Also, by providing the farmers with a copy of the soil sample results, Vigoro failed to exercise reasonable efforts to keep this information confidential. Any farmer could have taken the soil analysis provided by Vigoro and used it to purchase chemicals from a competitor. And the evidence shows that many did just that. There is simply no incentive for the farmer not to disclose this information. In fact the incentive is to disclose in order to get the benefit of the best advice as to the proper blend of fertilizers.

C. Credit Information
Credit information may be acquired from a credit bureau prior to entering into a credit transaction with a potential customer. Accordingly, this information is readily ascertainable and is not entitled to protection as a trade secret. Furthermore, such information has a short "shelf-life." Updated information is needed for any significant financial commitment.

D. Farmer's history of crops planted, timing of planting, crop rotation schedule and plans for future planting.

E. Vigoro's history of product sales to the farmer, revealing farmer's preference for various fertilizer and pesticide products.

F. History of scouting.
With respect to each of these three categories of information, the Court finds *1164 that the respective information was either generally known or was readily ascertainable once the identities of the farmers were known. The Court has already determined that the farmers' identities were readily ascertainable. The farmer-customers would, in their own self interest, provide such information to any competitor of Vigoro with whom the farmers might choose to deal. Further, this is not the type of information that the Act was intended to protect, as its independent economic value is scant.

II. BREACH OF FIDUCIARY DUTIES AND BREACH OF CONTRACT
Every employee owes his or her employer a duty of loyalty. Because Arkansas cases describing an employee's duty in this regard are scarce, the Court turns to law from other states for guidance. Applying Minnesota law, the Eighth Circuit recently described the common law duties imposed on an employee:
With regard to breaching a duty of loyalty, an employee owes his employer a duty of loyalty which prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer, while he is still employed.
Eaton Corp. v. Giere, 971 F.2d 136, 141 (8th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).
In Cudahy Co. v. American Lab., Inc., 313 F.Supp. 1339, 1346 (D.Neb.1970), the district court discussed an employee's right to make preparations to enter into competition with his former employer:
The mere planning, without more is not a breach of an employee's duty of loyalty and good faith to his employee. [citations omitted]. Admittedly the mere decision to enter into competition will eventually prove harmful to the former employer but because of the competing interests of allowing an employee some latitude in switching jobs and at the same time preserving some degree of loyalty owed to the employer the mere entering into competition is not enough. It is something more than preparation which is so harmful as to substantially hinder the employer in the continuation of his business. Obviously then each case must be decided on its own facts. Because of the competing interests the actionable wrong is a matter of degree.
In Cudahy, the court concluded that the plaintiff's former employee did not improperly solicit the plaintiff's customers for the employee's new business. The court specifically noted that "[a] departing employee may not solicit his employer's customers but he may advise the customers of his intention to leave and set up a competing business." Id. at 1347.

A. Solicitation of Vigoro's Customers
There is no evidence that Crisp attempted to solicit any of Vigoro's customers prior to his July 28, 1993, letter to Vigoro's customers. The critical issue is whether this letter, coming on the heels of Crisp's July 16, 1993, resignation from Vigoro, was an improper solicitation of Vigoro's customers. The Court holds that, under the circumstances, a simple notification by Crisp to the farmers in the area that he was leaving Vigoro and moving into a competing business would not breach any fiduciary duties owed by Crisp to Vigoro. Crisp continued to work for Vigoro after sending his letter of resignation because Vigoro requested him to stay on. In his letter of resignation he stated, "We are willing to continue 10  20  30 days, whatever time it takes to make the transition." Vigoro asked him to stay on until August 7, some twenty days after his resignation letter. Everyone knew that Crisp was leaving and that his plans were to continue in the "Ag business." Indeed, in his letter of resignation he had expressed an interest in "purchasing your rolling equipment and in leasing your facility for three years." (Pl.'s exh. 16.) Under these circumstances, Crisp could, without violating any duty to Vigoro, notify Vigoro's customers that "Effective August 7, we will no longer be associated with Vigoro" and that, "Our new company will be Cleveland Chemical Company of Arkansas." But does the remainder of the letter go beyond that and constitute an improper solicitation? The letter, which is addressed to "our valued customers", provides the new business' telephone numbers and goes on to state:

*1165 We apologize for any inconvenience this may cause you, but we feel this change will enable us to offer you better services in the future. As always, we look forward to serving any needs you might have.
The Court concludes that this crosses the line from simple notification to an active solicitation at a time when Mr. Crisp was still working for Vigoro. This solicitation constituted a breach of Crisp's duty of loyalty to Vigoro. The consequences of this ruling, that is, the damages due Vigoro, will be discussed infra.

B. Confidential Information
Vigoro also contends that Crisp, Washburn, Scarborough and Cavette breached their fiduciary duties to Vigoro by disclosing confidential information. Vigoro has already failed in its attempt to classify this information as a trade secret.
The proof does not indicate that Washburn, Scarborough or Cavette disclosed any confidential information prior to leaving Vigoro. The Court finds that the only confidential information belonging to Vigoro that arguably was improperly disclosed consisted of certain information that was disclosed by Crisp to Cleveland Chemical concerning his estimated payroll and estimated sales for the new venture prior to his departure from Vigoro. The Court finds that this information should be treated as general business information within Crisp's grasp by virtue of his twenty-plus years in the business rather than as Vigoro's confidential information. Furthermore, even if this information was confidential, Vigoro was not harmed in any way by the disclosure thereof.
Regarding what Vigoro labels the improper use of its confidential information after the departure of its former employees, the Court makes the following findings. First, the Court finds it necessary to distinguish between the use of confidential information acquired by a former employer and the use of experience and general knowledge acquired by many years of working in an industry and a lifetime of living in a small farming community. The testimony in this case indicates that it was the latter that Crisp and the Marvell employees took with them to their new employer, Cleveland Chemical. Thus, the Court concludes that Crisp, Cavette, Scarbrough, and Washburn did not improperly use or disclose any of Vigoro's confidential information after their departure from Vigoro.

C. Breach of Contract
Vigoro also contends that Defendants Crisp, Cavette, Scarborough and Washburn breached certain nondisclosure agreements[5] by disclosing confidential information belonging to Vigoro. The Court has found that Defendants Crisp, Cavette, Scarborough and Washburn did not disclose any confidential information belonging to Vigoro. Accordingly, consideration of the nondisclosure agreements is unnecessary.[6]

III. CONSPIRACY TO BREACH FIDUCIARY DUTIES
Vigoro claims that the Cleveland Defendants, Kenneth Crisp, Cavette, Scarborough and Washburn conspired jointly for Crisp, Cavette, Scarborough and Washburn to breach their fiduciary duties to Vigoro. The Court has already determined that Crisp is the only defendant who breached any fiduciary duties owed to Vigoro. Again, the evidence does not support Vigoro's theory that any of the other Defendants conspired with *1166 Crisp to assist or encourage him or any of the other named defendants to breach his or their fiduciary duties. The Court specifically finds that Crisp's actions were his own and were not prompted by, or caused by or taken in concert with, any other Defendant. Accordingly, there was no conspiracy relating to the breach of the fiduciary duties of Crisp or the other named Defendants. The breaches by Mr. Crisp were his own doing. They were not induced or caused by the act or acts of any other Defendant.

IV. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND BUSINESS EXPECTANCIES
Vigoro claims that the Defendants committed the tort of intentional interference with business expectancies and contractual relations in two different ways. First, Vigoro contends that each of the remaining Defendants, the Cleveland Defendants, Crisp, Cavette, Scarborough and Washburn, intentionally interfered with Vigoro's expectation of continuing long-standing customer relationships. Second, Vigoro contends that the Cleveland Defendants and Crisp intentionally interfered with Vigoro's expectation of a continued long-term relationship with its at-will employees. Both of these relationships that Vigoro seeks to protect from interference involve business expectancies or contracts terminable at will, which is the equivalent of an expectancy, as opposed to an existing contract in which the contracting parties are not free to contract with a third party. This distinction is important as the law recognizes more extensive employee privileges in cases involving interference with a business expectation than it does for cases involving interference with an existing contract that is not terminable at will. Walt Bennett Ford v. Pulaski Cty. Spec. Sch. Dist., Supplemental Opinion on Petition for Rehearing, 274 Ark. 208, 624 S.W.2d 426, 429-30 (1981) (quoting Prosser, Torts, § 130 (4th Ed.1971)).
The basic elements of a prima facie case of the tort of interference with contractual relationships under Arkansas law are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Walt Bennett Ford v. Pulaski Cty. Spec. Sch. Dist., 624 S.W.2d 426, 429 (1981). With regard to what constitutes tortious interference, the law generally requires that the interference be improper. See Restatement (Second) of Torts, § 766B, cmt. d and § 767 (1979) (entitled "Factors in Determining Whether Interference is Improper"); Devitt, Blackmar & Wolff, Federal Jury Practice and Instructions, Civil, Vol. 3, § 88.01 (3rd ed. 1987). The plaintiff bears the burden of proving that a defendant's interference was improper. In other words, a defendant is only liable for interference that is deemed improper.
When the alleged interference involves an employment contract terminable at will or a simple business expectancy, the law recognizes a privilege to compete. That privilege has been described as follows:
Where the contract interfered with is terminable at will, however, the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business man that a customer will continue to do business with him. With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself. Accordingly, the considerable weight of authority holds that there is a privilege of competition which extends to inducing the termination of agreements terminable at will, whether they concern employment or other relations.
Prosser, Torts, § 129 at p. 946 (4th Ed.1971). The Restatement (Second) of Torts, § 768 (1979), outlines the distinction between proper and improper competition:
(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue in an existing *1167 contract terminable at will does not interfere improperly with the other's relation if
(a) the relation concerns a matter involved in the competition between the actor and the other and
(b) the actor does not employ wrongful means and
(c) his action does not create or continue an unlawful restraint of trade and
(d) his purpose is at least in part to advance his interest in competing with the other.
(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
The Court has been unable to locate any Arkansas case which precisely outlines how the burden of proof should be allocated in a case involving the privilege of competition. Generally speaking, the case law suggests that "Arkansas law regards `privilege' as a defense." Scholtes v. Signal Delivery Serv., Inc., 548 F.Supp. 487, 496 (W.D.Ark. 1982) (referring to former employer's claim that communications with a prospective employer regarding an employee's job performance were privileged). In its supplemental opinion in Walt Bennett Ford, the Arkansas Supreme Court noted that "the defendant may show that his interference was privileged." 274 Ark at 214A, 624 S.W.2d at p. 429 (involved privilege to protect the public interest asserted by school board members sued by unsuccessful bidder on contract with the school district for interference with prospective contract). Based on this language, it would appear that Arkansas law places the burden of proof squarely on a Defendant's shoulders to show that his or her conduct was privileged. As the Court has already pointed out, however, the Arkansas courts have not squarely addressed the issue of a Defendant's right to compete as it relates to the tort of intentional interference. For the reasons more fully developed below, this Court is convinced that where the privilege of competition is involved, the Arkansas Supreme Court, were it to consider the issue, would not place the burden of proof on a Defendant to show that his conduct was privileged.
At the outset, the Court notes that the tort of intentional interference enjoys a great deal less development than other torts. As noted in the Second Restatement:
The result is that there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently of proving that issue; and it can not be predicted with accuracy what rule will ultimately develop. Instead of laying down a categoric rule for one position or the other, therefore, it seems appropriate to draw a more particularized line depending upon whether the precise matter goes more specially to the culpability of the actor's conduct in general or to its justification under specific facts. (Cf. § 870). Thus the question of whether the actor was competing with the other for the prospective business of a third person might be treated as a matter of culpability (cf. § 768), for which the burden of pleading and proving would be on the plaintiff, while the question of whether there was a special relation existing between the actor and the third party making it appropriate for the actor to advise freely with the third party might be treated as a matter of justification for which the burden would be on the defendant.
Restatement (Second) of Torts, § 767, cmt. k (1979).
Some courts apply different standards based on whether the interference involves a contract terminable at will or a business expectancy, rather than a contract not terminable at will. For example, the Virginia Supreme Court noted that:
[T]he prima facie approach of basing liability on a mere showing that a third party's intentional interference with a contract terminable at will caused damages requires too little of the plaintiff.
Consequently, when a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference must allege and prove not only an intentional interference that caused the termination of the at-will contract, but also *1168 that the defendant employed "improper methods."
Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 836 (1987).
So, to establish the tort of intentional interference when a business expectancy rather than an existing contract is involved and when the right of competition is involved, the plaintiff, rather than the defendant, should bear the burden of proving that the defendant used improper means or methods to compete with the plaintiff. The freedom to compete is simply too important to the economic health of our nation for any other rule to prevail. It should also be noted that many of the cases considered by the Arkansas courts, including Scholtes and Walt Bennett Ford, involved officious intermeddlers, that is, third parties with no legitimate interest in the business expectancy or contract that was the subject of the alleged interference. In contrast, this case involves parties with legitimate and vital interests in Vigoro's customers. Crisp, Cavette, Scarborough and Washburn all made their living, as did Vigoro's competitors in Phillips County, selling chemicals and fertilizer to the farmers of Phillips County. As employees at will with no covenants not to compete, they had every right to leave Vigoro and compete for the same customers in the same business. Cleveland Chemical is a legitimate competitor in the industry, and its decision to open a retail outlet in Marvell, Arkansas was a legitimate business decision. In short, Vigoro has failed to prove that any Defendant other than Crisp improperly interfered. See the discussion regarding Crisp's improper interference, infra.
Although the Court has determined the approach it believes the Arkansas Supreme Court would take if confronted with the issue, whether Vigoro bears the burden of proving improper competition or whether Cleveland Chemical and the other Defendants bear the burden of proving they were privileged to compete makes little practical difference in this case. Regardless of where the burden of proof falls, the evidence in this case is inadequate to hold any of the Defendants other than Crisp liable for the tort of intentional interference with Vigoro's business expectancies. The Court will first address Vigoro's claim of intentional interference as it relates to Cavette, Scarborough and Washburn. Second, the Court will address Vigoro's claim as it relates to the Cleveland Defendants. Finally, the Court will address Vigoro's claim as it relates to Crisp.
First, with respect to Defendants Cavette, Scarborough and Washburn, the evidence presented failed to prove that any of these three Defendants, prior to leaving Vigoro's employ, intentionally interfered with Vigoro's customer relationships or in any way caused any of Vigoro's customers to cease doing business with Vigoro. The evidence shows only that after these Defendants left Vigoro and joined Cleveland Chemical, a large number of farmers in the area began to do business with Cleveland Chemical. The evidence presented does not show that any intentional acts of any of these Defendants, while still employed as salespeople at Vigoro, caused or contributed to this result. Once Cavette, Scarborough and Washburn left Vigoro and began working for Cleveland Chemical in a competing business, they had every right to try to solicit business from Vigoro's former customers. As the Court has already noted, a finite number of farmers exist in Phillips County. All of the agricultural supply stores in the area, and there were at least two more such entities other than Vigoro and Cleveland Chemical, competed to meet the needs of this fixed number of customers. The proof in this case indicates that Cavette's, Scarborough's and Washburn's only intentional acts with respect to Vigoro's customers were to continue to do business with, and attempt to solicit the business of, these customers after they began working for Cleveland Chemical. This evidence will not suffice to establish the tort of intentional interference.
The Court now turns it attention to the Cleveland Defendants' potential liability for intentional interference. In regard to Vigoro's expectancy of continued relationships with its customers and of continued relationships with its at-will employees, the evidence clearly establishes that Cleveland Chemical and the Messrs. Sanders did not *1169 commit any improper acts of interference. When Crisp inquired concerning Cleveland Chemical's possible interest in a new retail operation, Cleveland Chemical responded to what appeared to be a good and legitimate business opportunity. The Messrs. Sanders knew of Crisp's reputation for excellence in the industry and they sought to take advantage of this potentially profitable business arrangement. The Sanders' intention was not to destroy Vigoro or to entice Vigoro's employees to leave Vigoro and join Cleveland Chemical. Instead, their intention was to start a new business venture headed by a man who had proven his abilities for over twenty years in the business. This was a legitimate goal. The Court also finds that Cleveland Chemical's motivation was not to obtain access to any of Vigoro's confidential information. The Cleveland Defendants were as surprised as Vigoro to learn, upon Crisp's resignation from Vigoro, that each and every one of the employees who had been working for Crisp at Vigoro had chosen to leave Vigoro and come to work for him at Cleveland Chemical. And the fact, if it is a fact, that the Cleveland Defendants may have chosen to compensate Vigoro's former employees at better rates of pay is of no legal consequence.[7] In short, the evidence does not support a finding that Cleveland Chemical Company, Jimmy Sanders or Michael Sanders intentionally and tortiously interfered with Vigoro's business expectations. They did not have improper intentions, nor did they use improper means or methods. An opportunity was put in their laps and they enthusiastically accepted it by investing large amounts of their own capital in this new venture.
Finally, the Court turns its attention to Defendant Kenneth Crisp and the issue whether any of his actions rise to the level of tortious interference. First, the Court addresses the issue whether Crisp improperly interfered with Vigoro's expectation of continued employment relationships with its employees. Second, the Court will address the issue whether Crisp improperly interfered with Vigoro's expectation of continued business relationships between Vigoro and its long-term customers.
With regard to the first issue, the Court finds that Crisp did interfere with that expectation and, further, that the interference was improper. It is clear in reading Crisp's letter of resignation that he had probably secured the commitment of all or most of Vigoro's other employees prior to his own resignation.[8] This was improper. The issue of what Vigoro's resultant damages were, or are, is the more difficult question. The evidence presented at trial all points to the conclusion that Vigoro's Marvell employees were far more loyal to Kenneth Crisp than to Vigoro. Accordingly, it is more probable than not that had Crisp waited until after he resigned from Vigoro to offer positions to his co-workers, the result would have been the same  the Marvell employees would have preferred to work for Crisp, whom they knew and trusted, than for Vigoro. In this connection, Crisp and the other employees of Vigoro had heard rumors that Vigoro would soon sell the Marvell Farmarket. Thus, Vigoro's real damage was in being deprived of the opportunity to compete on a level playing field with Crisp to retain their at-will employees. What damages is Vigoro entitled to for these actions by Crisp? The Court addresses the issue of damages separately below.
With regard to the issue of Crisp's interference with Vigoro's expectation of continued business relationships with its customers, the Court finds that Crisp did not improperly *1170 interfere with those relationships. The Court notes that Crisp had every right to solicit Vigoro's former customers once he began working for Cleveland Chemical in a competing business. Thus, the critical periods for purposes of the tort of intentional interference are the period prior to Crisp's resignation and the period after Crisp resigned but prior to his actually leaving Vigoro. The Court has already found that Crisp breached his duty of loyalty owed to Vigoro when he sent a letter soliciting business to Vigoro's customers shortly after his resignation but prior to his actual departure. See Part IIA supra. The Court hereby finds that this was Crisp's only intentional act of interference relating to Vigoro's customers that was not privileged competition. Accordingly, the Court must answer the question of whether this solicitation improperly interfered with Vigoro's expectation of continued business relationships with its then existing customers. For the reasons stated below, the Court concludes that it did not. The record in this case makes it clear that Vigoro's customers ceased doing business with Vigoro, not because of this solicitation by Crisp, but because they received what they considered to be better price and service from Cleveland Chemical and because they were familiar with and respected Crisp's expertise in the field of agriculture. Crisp had acquired the respect and confidence of the farmers in the area by his lifetime of work in the industry, first as a farmer himself and later in his 24 years as the general manager of Vigoro's Marvell Farmarket. The confidence and respect that Crisp inspired in the farmers in the Marvell area was not Vigoro's property. Rather, these intangibles were, and are, Crisp's assets, which he may properly use to his competitive advantage in the marketplace.

V. KENNETH CRISP'S COUNTERCLAIM FOR PAYMENT UNDER VIGORO'S INCENTIVE PLAN
Kenneth Crisp filed a counterclaim in which he alleges that Vigoro owes him $53,325 pursuant to the terms of the incentive plan in place for fiscal year 1993. Vigoro disputes Crisp's calculation under the incentive plan and instead arrives at a figure of $10,300. Additionally, Vigoro contends that Crisp is not entitled to receive any incentive pay at all because (1) the plan contains language that permits Vigoro to deduct any amount deemed "appropriate as a penalty for mismanagement of total assets of the Farmarket" (Pl.'s Exh. 47, par. III. H.); (2) the otherwise payable amount is a setoff against Crisp's liability to Vigoro; and (3) under the "faithless servant rule", an employee forfeits compensation attributable to periods when the employee has failed to faithfully serve his employer.
The Court will first decide the dispute over what amount is due and owing under the plan itself. Second, the Court will analyze Vigoro's three defenses to payment. As described below, the Court concludes that Crisp is entitled to receive $51,950.00 pursuant to the terms of the incentive plan in effect for fiscal year 1993. This amount will be set-off, however, against the amount of damages owed by Crisp to Vigoro for his breach of fiduciary duty and intentional interference with Plaintiff's business expectancy.
The parties agree that the 1993 "Contribution to Overhead" is the sum of $536.000.00. This forms the starting point for the computation of the amount due Crisp under the incentive plan. And the parties agree that Vigoro paid a total of $41,925.00 to Dennis Cavette and the Marvell employees.
The parties disagree on how to treat the $17,000.00 "net past due receivables greater than 180 days." Sixteen thousand dollars of this figure represents the debt on Dennis Storey's account at the end of fiscal 1993. That indebtedness was collected in August of 1993 because Vigoro insisted on it being paid before employing Storey as a Farmarket salesman. The Court finds that $1,000 of these receivables should be deducted from the pool.
Vigoro argues that $175,000 in "uncollected unapproved sales", (Pl.'s Exh. 61) should be deducted on the theory that Crisp allowed four customers to charge purchases in excess of their credit limits. The Court disagrees. Vigoro in the past had not applied this provision in making computations under the plan. It is estopped from departing *1171 from this practice in 1993. Furthermore, Vigoro continued to sell to these accounts after August 7, 1993. Finally, over $80,000 of these accounts has been collected by Vigoro, leaving some $94,000 still to be collected. The Court concludes that under the plan as interpreted and applied by Vigoro, none of this total sum of $175,000 should be deducted.
The parties agree that the "accrual adjustment" comes to $34,000.00. And there is no objection to the $625.00 figure representing 50% of net collectables.
On the basis of the above rulings, the amount due to Mr. Crisp on the 1993 plan would calculated as follows:

Contribution to overhead $536,000
Deduction for past due receivables in excess of 180 days
 past due 
Accrual Adjustment due to deductions 34,000
 _________
 NET 569,000
Incentive based on formula (8%/20%/25%) --------------> 93,250
Fifty percent of net collections 625
 ________
 NET 93,875
Less amounts paid to Marvell employees 
 ________
 NET INCENTIVE PAYABLE ----------------------------> $ 51,950

So, under the plan as interpreted by the Court, Crisp would be entitled to $51,950.00 on the incentive plan for 1993. Would Vigoro be permitted to refuse to pay this sum of the basis of Crisp's alleged "mismanagment of" the Farmarket's total assets or under the faithless servant rule? The answer is clearly no. During fiscal year 1993, Crisp managed the assets of the Farmarket in the best interest of Vigoro. And he was not a faithless servant in carrying on the Farmarket's business. However, offset adjustments will be made. See the discussion of damages, infra.

VI. VIGORO'S DAMAGES DUE TO CRISP'S IMPROPER ACTS
The Court has found that Kenneth Crisp is liable to Vigoro for soliciting customers prior to his departure from Vigoro, see supra, and for obtaining the commitment of his fellow employees (or most of them) to leave Vigoro prior to his actual resignation from Vigoro, see supra. The Court must now determine what damages Vigoro is entitled to for the wrongs committed by Crisp.
Vigoro contends that it is entitled to receive damages for lost profits in the amount of $4,630,000 for a five-year period beginning in July of 1993. Vigoro's calculation is based on its estimated lost profits over the five-year period.[9] Vigoro's damage figure is completely unsupported by the facts of this case. Contrary to Vigoro's assertion, this is not a case where competitors and a company's employees joined a calculated conspiracy to put the company out of business. Rather, Vigoro's "lost profits" are due almost exclusively to the competitiveness of the marketplace. The market for agricultural supplies in Marvell, Arkansas, already competitive when Cleveland Chemical opened its doors, became increasingly competitive with Cleveland Chemical's entry into the market. The Court has already determined that Cleveland Chemical has done nothing wrong. To award Vigoro its lost profits against Kenneth Crisp would effectively punish and nullify legitimate competition.
The Second Restatement states the appropriate damages for interference with prospective relationships:

*1172 (1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
(a) the pecuniary loss of the benefits of the contract or the prospective relation;
(b) consequential losses for which the interference is a legal cause; and
(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.
Restatement (Second) of Torts, § 774A (1979).
The evidence makes it abundantly clear that had Crisp simply quit, left Vigoro, and then approached Cleveland Chemical and the Vigoro salespeople and employees to open a new business, the result would have been essentially and substantially the same. All or almost all of Vigoro's employees would have gone with the new venture and most of the former customers of Vigoro would have chosen to do business with Crisp. But there would have been a delay in Vigoro's employees leaving.
The premature solicitation of Vigoro's customers by Crisp did not in the Court's judgment result in any damages to Vigoro. Had he abstained from making such a solicitation until his departure on August 7, 1993, the result would have been the same. Thus, for this breach Vigoro is entitled to only nominal damages.
Kenneth Crisp's offering employment to the other twelve employees of Vigoro's Marvell Farmarket probably had more serious consequences. Had Vigoro had an equal opportunity to compete with Crisp for the future services of its employees, one and possibly more of those employees might have remained with Vigoro. In terms of the probable outcome of the employees' separate decisions, it is the Court's determination that most or all of Vigoro's erstwhile employees would have in any event opted to join Crisp's new operation. But this does not mean that Vigoro was not damaged by Crisp's premature contacts with Vigoro's other employees. For one thing, the new Cleveland Chemical operation would not have been able to get started immediately on August 7 if Crisp had waited until that date to contact the employees. And a delay of a month or so in getting the Cleveland Chemical operation started could have resulted in commitments being made by Vigoro's customers for their full requirements before Crisp's new operation could have gotten underway. It is obviously difficult for the Court to determine the amount of damages, by way of lost profits that Vigoro may have sustained. Nevertheless, from all of the facts and circumstances the Court determines that Crisp's actions damaged Vigoro in the total sum of $75,000.00.
The Court expressly finds that Crisp did not commit any of the described wrongful acts wilfully or deliberately. Thus, there is no basis, under the faithless servant rule, for causing Crisp to forfeit that portion of his salary that he earned from Vigoro from May of 1993 until his departure in August of 1993 as requested by Vigoro. See Baldwin v. Prince, 265 Ark. 384, 389, 578 S.W.2d 240, 243 (1979) ("Mere breach of agency contract, even though inconsistent with the good faith due the principal, is not ground for forfeiture of compensation already earned.").
The amount due Crisp under his incentive plan with Vigoro, namely the sum of $51,950.00, must be offset against the $75,000 in damages that Vigoro sustained. The effect will be that Vigoro will be entitled to a net judgment against Kenneth Crisp in the amount of $23,050.00.
NOTES
[1] The Court finds that Mr. Crisp honestly and sincerely believed that Vigoro, despite all its protests to the contrary, was not committed to providing adequate dry storage facilities (which impaired his ability to serve his customers during peak demand periods) and the other equipment and support needed to meet the competition and to capitalize on the market.
[2] This is further confirmed by the contents of Crisp's letter of resignation dated July 16, 1993, in which Crisp expressed an interest in purchasing Vigoro's rolling equipment and in leasing its facilities.
[3] In AMP Inc. v. Fleischhacker, 823 F.2d 1199 (7th Cir.1987), the court noted the significance of the existence or non-existence of a covenant not to compete, stating:

While an enforceable restrictive covenant may protect material such as confidential information revealed to an employee during the course of his employment, which does not constitute a trade secret, an employer's protection absent a restrictive covenant is narrower and extends only to trade secrets or near-permanent customer relationships.
Id. at 1201.
[4] In this connection it is interesting to note that plaintiff's damage theories here project losses over a period of five years or longer.
[5] The two agreements at issue involve a document entitled "Understanding of Employee Secrecy Obligations," signed by Cavette, Scarborough and Crisp, and a document entitled "Employee Invention and Trade Secret Agreement," signed only by Washburn. Vigoro was unable to produce a document signed by Crisp in a capacity other than as a witness, but the Court explicitly finds, based on Crisp's trial testimony and other evidence in the case, that Crisp did in fact sign a like document at some point.
[6] Were consideration of the nondisclosure agreements necessary, however, the Court would have to determine as a threshold matter whether certain language in the documents violates Arkansas public policy. This determination would be critical because if any portion of the documents were found to violate the public policy of Arkansas, the entire agreement would be invalidated as the Arkansas courts refuse to remake a contract for the parties. See Rector-Phillips-Morse v. Vroman, 253 Ark. 750, 755-56, 489 S.W.2d 1 (1973).
[7] The Court finds itself in agreement with the majority rule on this issue as expressed in Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981 (2nd Cir.1918):

Nobody has ever thought, so far as we can find, that in the absence of some monopolistic purpose everyone has not the right to offer better terms to another's employee, so long as the latter is free to leave. The result of the contrary would be intolerable, both to such employers as could use the employee more effectively and to such employees as might receive added pay. It would put an end to any kind of competition.
(quoted in 2 Callmann on Unfair Competition, Trademarks, and Monopolies, § 9.03 (4th ed. 1986)).
[8] Crisp notified Vigoro in his resignation letter that "[a]ll of the employees at Vigoro in Marvell will be leaving with me."
[9] The predicate for such a theory consists of the opinions of certain of Vigoro's officers and employees. The Court does not accept or credit this "expert" testimony. Furthermore, no rational basis supports it. The Court finds many other problems with the Plaintiff's damage theories but need not deal with them because of its other rulings.